# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 21, 2015 Session

## STATE OF TENNESSEE v. DEBORAH WEN YEE MARK

**Appeal from the Criminal Court for Wilson County**
**No. 2010-CR-451       David E. Durham, Judge**

---

**No. M2014-00651-CCA-R3-CD – Filed August 10, 2015**

---

Appellant, Deborah Wen Yee Mark, was convicted of one count of first degree murder during the perpetration of aggravated child abuse, four counts of aggravated child abuse, and four counts of child abuse. The trial court sentenced appellant to life for the murder conviction, twenty years at 100% release eligibility for each of the aggravated child abuse convictions, and three years as a Range I, standard offender for each of the child abuse convictions. The trial court aligned each of the aggravated child abuse sentences consecutively to each other and consecutively to the life sentence. The child abuse sentences were aligned consecutively to the life sentence but concurrently with each other and with the aggravated child abuse sentences for an effective sentence of life plus eighty years. Following her unsuccessful motion for a new trial, appellant raises the following issues on appeal: (1) whether appellant was in custody during her questioning, triggering *Miranda* requirements; (2) whether her statement was coerced and involuntary; (3) whether the trial court erred in admitting the victim's adoption video; (4) whether the evidence is sufficient to support appellant's aggravated child abuse conviction in Count III of the indictment vis-à-vis the finding of "serious bodily injury" based on the loss of four primary teeth; and (5) whether the trial court erred in aligning appellant's aggravated child abuse sentences consecutively. Following our extensive review, we affirm the judgments of the trial court, but clerical errors in the judgment forms require remand for correction as detailed fully below.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Remanded for Entry of Corrected Judgments**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

James G. Thomas, Chandra N.T. Flint, and L. Wells Trompeter (on appeal), Nashville, Tennessee; and B.F. (Jack) Lowery and Jack D. Lowery (at trial), Lebanon, Tennessee, for the appellant, Deborah Wen Yee Mark.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Thomas Harwell Swink and Jason Lee Lawson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case involves the death of a four-and-a-half-year-old victim who had been adopted from China and relocated to the United States approximately ten weeks before her death. The victim's adoptive parents, appellant and her husband, Steven Mark, were charged individually with multiple crimes for their involvement in her death.

Appellant was charged in a nine-count indictment as follows: (I) felony murder committed during the perpetration of aggravated child abuse; (II) aggravated child abuse, injury to the victim's head and body; (III) aggravated child abuse, injury to the victim's mouth; (IV) aggravated child abuse, injury to the victim's breast and nipples; (V) aggravated child abuse, injury to the victim's skeletal system; (VI) child abuse, injury to the victim's hands and fingers; (VII) child abuse, injury to the victim's face and eye; (VIII) child abuse, injury to the victim's thighs; and (IX) child abuse, injury to the victim's back.

I. Facts

Prior to trial, appellant filed a motion to suppress her statement, alleging that she had not been fully apprised of her *Miranda* rights and that her statement had been coerced.

A. Motion to Suppress

At the November 16, 2011 hearing on appellant's motion to suppress her statement, the State's first witness was Detective Bonnie Harris with the Mt. Juliet Police Department. Detective Harris had been in law enforcement for thirteen years and had served as a detective for seven years. As a detective, her cases involved primarily domestic abuse, child abuse, sexual assaults, and sex crimes in general. As part of her training, Detective Harris had received "several, several hours of interview and interrogation, child abuse investigation, homicide, a wide range of in-service training." She had attended the John Reid Interviewing Techniques School, which provided twenty-four hours of specialized training, and the Regional Organized Crime Information Center, which provided eight hours of interviewing and body language training. Detective Harris

also received thirty-six hours of training in child abuse cases through the Office of Juvenile Justice and Delinquency Prevention.

Detective Harris testified that on July 10, 2010, she received a call from a patrol officer about a possible child abuse case at Summit Medical Center. She and Detective David Stolinsky proceeded to that location, but while en route, she received notification that the victim had been air-lifted to Vanderbilt Children's Hospital, so they changed directions. Upon arrival at Vanderbilt, Detective Harris spoke with a social worker, who informed her that the victim presented with several injuries and that the parents had not seen the victim yet. Detective Harris then spoke with the emergency room physician, Dr. Mark Meredith, who advised her of the nature of the injuries, showed her pictures of the injuries, and opined that the injuries were severe and that the chance of survival was "scarce." She then entered the victim's room, viewed her injuries, and photographed them herself.

Detective Harris could not recall at what time she first encountered appellant but stated that their first encounter occurred after she had spoken with several other people. When Detective Harris first saw appellant, she was seated in the waiting room of the Intensive Care Unit ("ICU") with her husband, Steven Mark, and Detective Harris approached her and "asked if she would be willing to sit down . . . and discuss the reason why [the victim] was here today." Detective Harris, Detective Stolinsky, appellant, and a case worker from the Department of Children's Services ("DCS"), Julie Vantrease, walked to a nearby waiting room so they could sit down and discuss what had transpired. Detective Harris confirmed that appellant accompanied her voluntarily, that appellant was not "escorted," that she did not have to be "encouraged" to enter the waiting room, and that she did not indicate hesitance to accompany the group.

Detective Harris explained that the waiting room where appellant was interviewed was approximately ten to fifteen feet away from the elevators. The elevators allowed free access; there was no security, and one did not require a key or pass of any sort to access that exit. The waiting room itself contained a round table with three chairs on the left side of the room and a chair and table with a telephone on it in the right rear corner. Detective Harris described that Ms. Vantrease sat in a chair at the back of the room while the others sat at the table. Appellant sat facing the door, and Detective Stolinksy was the closest to the door but did not block access to it.

Detective Harris recalled that she began the discussion with appellant by informing her that her participation was "completely voluntary[] [and] that she was free to leave at any time." Detective Harris said, "I pointed to the door. I said, '[T]here's the door.' I told her that the only reason why the door was shut was because of privacy issues because it was a hallway." The waiting room was right off the hallway, and there was a lot of "foot traffic." She further informed appellant that she was free to leave; that

she was free to cease answering questions; that she was free to request an attorney, at which time they would stop the interview; and that regardless of what appellant told her in the interview, "she would be going home that night." Both detectives were dressed in plain clothes but were armed. Detective Harris described the tone of the discussion as "conversational" and stated that neither she nor Detective Stolinsky raised their voices.

Detective Harris explained that they began the conversation by asking how appellant adopted the victim, the victim's country of origin and background, information about the family dynamic, and background information with regard to appellant's eight-year-old daughter. Appellant answered the questions calmly and did not appear to be upset. Appellant volunteered that there were "some frustrations" with the victim's behavior, which changed shortly after they arrived in the United States after adopting her. The victim did not perform "on par" with how the Marks believed a four-and-a-half-year-old should with regard to her eating too slowly, not being toilet-trained, and being "very tiny" for her age. Detective Harris questioned appellant about injuries that she observed on the victim's nipples, and appellant "paused for a minute[,] and she kind of put her head down[,] and she said, '[Y]eah.' She said, 'I got frustrated and I did it.' . . . She said that she would twist and pull [the victim's] nipples and it made scaring [sic]." Detective Harris estimated that appellant made this admission "about an hour" into the interview.[1]

Maintaining the same "calm" and "conversational" tone, Detective Harris stated that she then inquired into the bruises on the victim's legs. Appellant replied that she would become frustrated with the victim and pinch the insides of her legs, leaving bruises. Appellant then stated that on Father's Day, the victim was "acting up [and] being defiant." The victim fell and struck her forehead, and appellant attempted to treat the bump with an icepack. The victim resisted the effort and kept squirming, and appellant, who acknowledged that she was frustrated, took the icepack and "slammed it in her facial area several times." Detective Harris asked appellant about the bruising on the victim's hands. Appellant explained that the victim would "pick" at her hands despite appellant's requests for her to stop. When this would occur, appellant would force the victim to hold out her hands, palms down, and appellant would strike the backs of her hands with a wooden cane appellant used in martial arts.

Detective Harris recounted that during the interview, appellant recalled that on one occasion, she and Mr. Mark were attempting to brush the victim's teeth, but the victim resisted and began a "breath-holding spell" wherein the victim would hold her breath until she lost consciousness. Viewing this as a defiant act, appellant forced the victim's mouth open to brush her teeth and in doing so, knocked out two of her front teeth. With

---

[1] Following this admission, Detective Stolinsky left the room to place a call to Detective Brian Harbaugh with the Wilson County Sheriff's Department. He remained out of the room until a break was taken.

regard to bruising on the victim's back, appellant said that during one of the "breath-holding spells," it was possible that she might have struck the victim harder than she realized, leaving a bruise.

At this time, another fifteen minutes had elapsed since the first admission by appellant, and Detective Stolinksy re-entered the room and requested a break. Appellant never requested to take a break. Detective Stolinsky asked appellant if she wanted to see the victim, and she replied affirmatively. They exited the room, and Detective Harris remained behind. The break lasted approximately fifteen minutes.

When the interview resumed, Detective Harbaugh participated but Detective Stolinsky and Ms. Vantrease were not present. Detective Harbaugh produced a digital recorder. Detective Harris introduced the detective to appellant and emphasized with appellant the same admonitions as she had earlier. The tone of the interview remained conversational, and Detective Harris told appellant that they needed to review with Detective Harbaugh the information appellant had previously disclosed. This "second segment"[2] of the interview lasted approximately three and a half hours, during which Detective Harris asked appellant if she needed to take a break. Appellant declined but indicated that she was thirsty, so Detective Harris gave her a soda. Detective Harris recounted, "Throughout the whole interview [appellant] was calm, conversational, you know, it wasn't accusatory. It was just talking."

Detective Harbaugh asked appellant if she wanted to discuss the victim's condition with a doctor, and they took a break so he could locate one. Appellant declined Detective Harris's offer of food, stating that she was unable to eat at that time, but accepted another soda. During the break, appellant became concerned that she had lost her cellular telephone in the parking garage, and Detective Harris summoned Vanderbilt security to look for it. Appellant never indicated a desire to search for the telephone herself and never asked to leave the room.

Detective Harris said that after the break, Dr. Paul Hain entered the room, addressed appellant, and summarized the victim's medical condition. The discussion lasted ten to fifteen minutes, during which no one raised his or her voice or became confrontational. While they were speaking, both detectives stepped out of the room and began placing telephone calls. Detective Harris telephoned Detective Stolinsky, who was at appellant's and the victim's home. She advised Detective Stolinsky to look for a mark on the wall where the victim could have struck her head. He told Detective Harris that he had located a bloody "onesie," i.e., an infant's one-piece body suit, in a sink and that he needed to know from where it came.

---

[2] The State refers to this portion of appellant's interview as the "second segment," and for ease of reference, we will incorporate the State's term for this portion.

-5-

Detective Harris stated that when the break concluded, she and Detective Harbaugh re-entered the room, and she asked appellant about the onesie. Appellant said that they changed the victim's clothing the previous night around 11:30 p.m. or 12:00 a.m. because the garment was soiled with saliva that was tinged with blood. The victim was not responsive, and they placed her in her bed and retired for the night. The conversation essentially ended at that point when a nurse entered and announced that appellant's pastor had arrived. Detective Harris observed appellant cry "for the first time," and the detectives exited the room, leaving appellant with her pastor. A DCS worker was waiting to question appellant with regard to her older daughter. This last segment of the interview was much shorter, lasting approximately thirty minutes.

Later that evening, the detectives spoke with appellant outside of her home. Detective Harris confirmed that no one escorted appellant from the waiting room or the hospital and that she was never in custody. Appellant left the hospital on her own accord. When they arrived, appellant was outside, so they spoke with her beside her automobile. Detective Harris again informed appellant that "she was free to walk away . . . at any time and stop talking to [them]." Detective Harris stated that appellant understood that. She then asked appellant about a "box":

> Mr. Mark admitted to Detective Stolinsky that during time[-]outs, at one particular time he put [the victim] in a cardboard box with her sitting in her like booster, high-chair seat, you know, the portable high-chair seats that you can take off the chair, put it in a box in the garage and placed another box over her for a time out session for discipline because she wouldn't eat fast enough.

Appellant denied any knowledge of such a practice. Detective Harris said that this exchange was "very brief." Detective Harris did not speak with appellant again.

On cross-examination, Detective Harris acknowledged that when she, Detective Stolinsky, and Ms. Vantrease first convened, they discussed their approach to the investigation. At some point, Detective Stolinsky telephoned the District Attorney's office because they had been given the impression that the victim was going to die. They decided that they were going to escort appellant and Mr. Mark to different rooms and interview them separately. They began by asking appellant to join them in a waiting room for a discussion. Detective Harris denied that appellant requested on "multiple occasions" to see the victim but agreed that she inquired as to the victim's condition.

Detective Harris was asked to draw a sketch of the room where they interviewed appellant. She confirmed that there were no windows in the room or in the door leading into the room. She denied that the only statements appellant gave were in direct response

to questions asked and instead characterized the interview as a "conversation" wherein they talked "back and forth." Detective Harris also emphasized that appellant would "bring up things" without being asked.

Detective Harris clarified that it was she, in fact, who requested the first break. She asked appellant if appellant would like a refreshment, and Detective Stolinsky asked if appellant wanted to see the victim. Appellant declined refreshments but accompanied Detective Stolinksy to see the victim. Detective Harris did not recall whether Detective Harbaugh joined Detective Stolinsky and appellant in the victim's room or whether Detective Harbaugh escorted appellant back to the waiting room. Detective Harris did not recall Detective Harbaugh's raising his voice to appellant and maintained that the tone remained conversational, even when he implied to appellant that she was not being honest. Detective Harris agreed that the introductory portion of the first interview segment could have been shorter than one hour and that the "incriminatory" portion could have lasted fifteen to thirty minutes. Detective Harris acknowledged that appellant was sometimes emotional but characterized her as "quiet" rather than "meek." She conceded that appellant appeared to have difficulty remembering certain things but disagreed that appellant was confused. She disagreed that appellant asked about the victim's condition more than ten times but agreed it might have been "a couple" of times.

Detective Harris stated that they separated appellant and Mr. Mark because they wanted to speak with them separately, not because they wanted to "isolate" them from each other. She agreed that once Detective Harbaugh arrived and began recording the conversation, appellant made no statements that were not recorded.

On re-direct examination, Detective Harris emphasized that nothing about appellant's demeanor indicated that her statement was not voluntary. She also confirmed that when she began the interview, appellant was not a suspect in the case. Detective Harris opined that generally the primary caretaker would be the suspect, who in this case was Steven Mark. Detective Harris's intent in separating the Marks was to obtain background information and to learn whether appellant, as a pediatrician, had observed any potential criminal behavior against the victim at the hands of Mr. Mark. She confirmed that at all times during the interview, appellant was "freely speaking," "clear [about] what she was saying," and neither evasive nor confused. Detective Harris stated that she never made any threats against or promises to appellant during the interview.

On re-cross-examination, Detective Harris admitted that although appellant was not a suspect at the beginning of the interview, she was soon developed as a suspect but that Detective Harris did not stop and administer *Miranda* rights at any time. She also confirmed that the door to the waiting room was unlocked during the interview.

The State called Detective David Stolinksy, a five-year-veteran detective with the Mt. Juliet Police Department, as its next witness. He testified that the only time he was with appellant in Detective Harris's absence was when they went to visit the victim. At some point during the first segment of the interview with appellant, Detective Stolinsky asked appellant if she wanted to see the victim, and he accompanied her to the victim's room. Prior to this, appellant had not expressed a desire to see the victim. They walked approximately thirty to forty steps to the victim's room in silence; upon entering the room, Detective Stolinsky stood on the left side of the victim's bed, and appellant stood on the right side. The room was enclosed in glass and had a sliding glass door. Medical personnel were either in the room the entire time or "were in and out constantly." He advised her that the detectives were "just trying to find out what happened" to the victim. Appellant did not make any statements during the approximately fifteen-minute-long stay in the victim's room. Detective Stolinsky never touched appellant or made any threats toward her.

On cross-examination, Detective Stolinksy read from his report, "During a conversation with [appellant] she became quiet and attempted to cry. This writer never saw a tear come from [appellant]. During one of her quiet times writer asked [appellant] to join him in [the victim's] room." Detective Stolinsky disagreed that this was a "direction" to appellant and characterized defense counsel's attempt to read it that way as an "exaggeration." He confirmed that he *asked* appellant to join him in checking on the victim. Counsel questioned Detective Stolinsky, "Well, you took her out of this room where she had been with you and Detective Bonnie Harris for over an hour and a half." Detective Stolinsky corrected counsel and stated, "Your time is off, I believe," then surmised that approximately one hour had elapsed. Detective Stolinsky reiterated that as a police officer, his purpose for being at the hospital was to find out what happened to the victim and conceded that he "paraphrased" his report:

> This writer explained to Dr. Mark that our goal was to find out what happened to [the victim], that she was a small innocent child who now [lay] in the hospital room with tubes and wires attached to her and that is just not right for a child to be in this position at her age at the hands of an adult.

Detective Stolinsky did not recall Detective Harbaugh's joining them in the victim's hospital room.

Upon further cross-examination, Detective Stolinksy clarified that when Detective Harbaugh arrived, he took Detective Stolinsky's place in the conference room where appellant was being interviewed and that Detective Stolinsky then joined Mr. Mark in a "quiet" room. He confirmed that when they first began interviewing appellant, she was not a suspect. He stated that about an hour into the interview, appellant admitted that she had injured the victim; he characterized those admissions as "shocking" to the detectives.

He testified that when appellant implicated herself, no one stopped to *Mirandize* her because she was not in custody.

The trial court asked Detective Stolinsky what time the interview started. Although he could not state the time definitively, he estimated that the interview began around 1:00 p.m. on July 1.

The State called Tennessee Bureau of Investigation Agent, formerly Detective, Brian Harbaugh as its next witness.[3] On July 1, 2010, Detective Stolinsky contacted the criminal investigations bureau of the sheriff's department and requested Detective Harbaugh's assistance at Vanderbilt Children's Hospital to investigate a case of possible child abuse. Upon arrival, he spoke with Detectives Stolinsky and Harris, who updated him on the investigation. He learned that a crime scene unit was searching appellant's residence and that detectives had been interviewing appellant. Detective Harbaugh also observed the victim. Collectively, the detectives decided that Detective Stolinsky would focus his attention elsewhere while Detectives Harris and Harbaugh continued to interview appellant. Detective Harbaugh had been at the hospital approximately fifteen minutes when he first met appellant; he entered a room where she was seated. He described the room as a rectangular room, approximately twenty feet long by twelve feet, that was adjacent to the nurses' station. He characterized the room as "a quiet room," although he did not know exactly how the room was utilized. He did not have to pass through security to access the room, and due to the room's location, the area immediately outside of it was "right in the middle" of everything, with "at least a dozen" people working in the area. He agreed that he was dressed in plain clothes but was clearly armed and wearing a badge.

Detective Harbaugh recalled that when he entered the quiet room, Detective Harris introduced him to appellant. Detective Harris then asked appellant to review some of the information she had previously disclosed for the purpose of updating Detective Harbaugh. He brought a digital audio recorder with him and turned it on prior to speaking with appellant. He described that he chose a chair that placed his back to the door, facing appellant. Detective Harris sat "off" to his right in a chair without a table so that the three of them formed a "triangle." He confirmed that there was space between appellant and the door and that someone seated in her position could have exited the room without his having to move out of the way. He said that the door was closed for privacy as well as to reduce the noise generated by the several people at the nurses' station.

---

[3] At the time of the investigation in this case, Agent Harbaugh was a detective with the Wilson County Sheriff's Department. Because all of the testimony and documents refer to him as "Detective Harbaugh," we will refer to him as "Detective." In doing so, we mean no disrespect.

Detective Harbaugh testified that before he started the recorder, the only conversation that took place involved typical cordial greetings. During that time neither he nor anyone in his presence threatened or coerced appellant. He turned the recorder on, and at the suppression hearing, the entire recording was played for the trial court. Thereafter, Detective Harbaugh, in response to questioning by the court, stated that the recorder was in a pocket of a black binder that was placed on the table at which he was seated with appellant. He recalled that he left the room twice during the interview. One time he left was after appellant indicated she had injured the victim with the icepack. He left the room to inquire of a doctor if any of the victim's injuries were consistent with that explanation.

Detective Harbaugh recalled that when the interview was completed, he left the hospital. As he was leaving, a DCS case worker was waiting to speak with appellant, but he did not stay for that interview. He and Detective Harris then drove to appellant's residence. Later that evening, they returned and spoke with appellant about the victim's being placed in a box for punishment. Appellant simply replied that she was tired and could not speak with them at that time. The detectives honored her statements and left her residence. They did not speak with her again.

On cross-examination, Detective Harbaugh indicated that he arrived at the hospital around 3:00 or 4:00 p.m.; he remembered the time because it was close to the end of his 8:00-4:00 p.m. shift. He estimated that the last interview of the evening was attempted around 9:00 p.m. Detective Harbaugh reviewed pictures of the hallway leading from the elevator to the nurses' station and agreed that one had to press a button to gain access through a set of double doors before reaching the nurses' station. He acknowledged that separating two individuals who are suspected in criminal activity was a common technique so that the individuals' explanations could be compared.

Detective Harbaugh conceded that he did not advise appellant that the interview was being recorded and that the recorder was not visible to her. He explained, "Well, I've found in the past that . . . anytime somebody knows that they're being recorded[,] they're . . . more apprehensive and they're just short on words and don't necessarily -- well, they just feel uncomfortable. It makes people feel uncomfortable." As such, he agreed that people were less likely to speak with him and answer questions.

Detective Harbaugh acknowledged that based on what Detective Harris reported to him, appellant had made certain admissions that would have constituted child abuse. Detective Harbaugh admitted that when he questioned appellant, he believed it was likely that she would provide additional incriminatory information and that the detectives discussed whether they should *Mirandize* her prior to beginning the second segment of the interview. Collectively, they decided against it because Detective Harris had previously explained to appellant that "she was free to leave and the whole non-custodial

route." He did not reiterate those points with appellant because he did not see any "sense going over it twice." He emphasized that he did not *Mirandize* appellant:

> Again, because it just wasn't called for. It's . . . non-custodial and during my conversation with her, we had talked about several things, about breaks or people coming in to see her, her leaving, her wanting to take breaks, me even offering to give her a ride. I mean, it never dawned on me that she felt that possibly she could not leave. I mean, it seemed to be very clear through our conversation that it was non-custodial.

Detective Harbaugh further agreed that he did not offer appellant a break until "around" the two-hour, thirty-three minute mark in the recording. He conceded that although the majority of the interview was conversational in tone, there were times when he cut off appellant's answer because he believed that she was withholding the truth and instead telling him a "story" that she thought he would believe. He recalled a point in the interview wherein he told appellant that he believed she needed anger management counseling. He agreed that appellant at one time indicated her fear that people would believe she was a child abuser and that he told her he did not think she was a child abuser. He explained, "[M]y job is to in a sense comfort her and get her to give me truthful statements and . . . calling them a child abuser doesn't put them in the greatest of mood." Counsel attempted to characterize this tactic as "disarming" people, but Detective Harbaugh characterized it as "building rapport." Counsel also directed Detective Harbaugh to two instances late in the interview: (1) appellant asked, "Can I get somebody to go check for my cell phone, right?" and (2) appellant asked, "[W]hat happens from here[?] I mean, I know that an investigator went with my husband to go to the house. I mean, are we allowed to have people here to support us[?]" Based on those statements by appellant, counsel asked Detective Harbaugh if the inference was that appellant did not feel free to leave. The State objected, and the trial court sustained based on speculation before he could answer.

Detective Harbaugh confirmed that when he and Detective Harris arrived at appellant's home that evening, they met outside. Appellant was staying at a neighbor's house because the crime scene unit was in her home and she was not allowed inside. Her husband was inside the home, but officers were not intentionally keeping them separated at that time.

Appellant testified at the suppression hearing. She stated that she had been a pediatrician since 2000, first in New Jersey and then in Mt. Juliet, Tennessee. She testified that she had never had any interaction with a law enforcement officer with the exception of one speeding ticket. She had never interacted with an officer during the course of her medical practice. She stated that she was taught as a child to respect authority.

-11-

Appellant recalled that on July 1, 2010, Mr. Mark informed her that the victim was being treated at Summit Medical Center. She was then advised that the victim had been air-lifted to Vanderbilt Children's Hospital. Based on her experience, she was aware that if a child were air-lifted to another facility, "there's usually serious injury." When she arrived at the hospital, she met and briefly spoke with Mr. Mark in the emergency room, which was on the first floor. Hospital personnel then escorted them to a private room adjacent to the emergency room. There, a doctor entered and told them that the victim was being treated, but he offered no information as to her condition.

Appellant stated that at some point, they were "led" from the private room downstairs to the intensive care unit upstairs. She said that "once [they] entered the intensive care unit," she and Mr. Mark were separated. She asserted that she was "taken" by detectives to a small waiting room within the ICU where she met with a female detective, a male detective, and a DCS worker. When asked how she felt about meeting with them, appellant responded, "I felt like I had to go with them, sir . . . . They were police officers." She said that she did not want to be in the room with them; she wanted to be with her husband and the victim in her hospital room. She claimed that no one informed her that she could go to the victim's room. Once questioning began, she said she felt she had to stay there and that she did not have the right to get up and check on the victim. She testified that had she known she had the right, she would have left the room and checked on the victim.

Counsel asked appellant if she knew how long she was in the waiting room that day. She answered only that she knew "it was a very long time." Counsel posited, "If I told you it was close to five hours would that sound somewhere about right?" to which she responded, "I believe so, yes. I believe so, sir." She maintained that during that time, she needed to use the restroom but no one asked if she needed to take a break to do so. When asked if anyone told her that she could leave the room, she stated that she remembered that "one of the officers mentioned something about a door, but [she] didn't feel [she] could leave." She said she felt as though she had to stay because they were police officers and she was trying to cooperate. She stated that during that time, there was "no time" at which she was not concerned about the victim and that no one apprised her of the victim's condition until toward the end of the interview. She reiterated that she would have never gone into the waiting room with the officers if she had not felt she had to.

On cross-examination, the State inquired into appellant's professional history as a medical doctor and asked how many times she had been in a hospital. She eventually acknowledged that she had been in a hospital more than 100 times. She recalled that she drove herself to Vanderbilt on the day in question. She parked and walked in, unescorted, then found Mr. Mark in the emergency room. Shortly thereafter, they were

-12-

directed to a waiting room where they stayed between twenty and thirty minutes before a doctor entered and informed them that the victim was being transferred to the ICU.

Appellant clarified that upon arrival on the ICU floor, she was approached by Detective Harris, separated from her husband, and "led" into a room. She recalled that Detective Harris said that she had questions for appellant but did not remember Detective Harris asking if appellant would be willing to speak with her. When questioned about whether Detective Harris asked if appellant would be willing to talk with her, appellant answered, "I don't remember the exact words that she used, sir. . . . I felt like she was telling me to go with her to answer questions, sir." She did not remember the detective telling her that she did not have to answer questions. Likewise, appellant stated that she recalled Detective Harris "saying something about the door, but [she] didn't feel like [she] could leave." In contrast, appellant admitted that she could remember the exact parking place she occupied that day when she gave instructions to help security find her missing cellular telephone.

Appellant confirmed that she told Detective Harbaugh that she wanted to hear about the victim's medical condition from a doctor and that in response, he said he would check on it. She acknowledged that he did so but added that it did not happen "immediately after [she] asked." She would not agree that Detective Harbaugh left the room "very shortly" thereafter and based her position on the fact that "as we heard on the tape yesterday, the doctor didn't come in until the very end of the interview." Appellant conceded that she was never verbally threatened but added that she was "raised up to respect the police's authority."

When the State questioned appellant about her needing to use the restroom during the interview, the following exchange was had:

Q: Let me ask you this: You're a forty-year-old woman, well-educated, medical doctor, did you need to go to the bathroom?

A: Yes, sir.

Q: Why didn't you ask?

A: Sir, I was in a room with police officers, sir.

Q: Ma'am, is it your testimony you felt you couldn't even ask if you could go to the bathroom?

A: Yes, sir.

In a similar manner, when asked if she ever requested to visit the victim's room, appellant answered, "I asked if someone could give me information on what's going on with [the victim]." The State repeated the question verbatim, and appellant responded, "I did not ask, sir, because I did not feel I would be allowed to, sir."

When asked how appellant left the hospital on the day in question, she answered that she left with one of the pastors from her church. She said that she was not able to talk with him until the time that she left with him. However, she also did not know when he arrived at the hospital so she "couldn't have asked to see him because [she] wouldn't have known that he was there." She recalled, from listening to the tape, that toward the end of the interview, she asked Detective Harbaugh "if [she] could have church people there with [her], and he responded, "'[Y]es, you can have church people there.'"

The trial court issued a thorough ruling:

> [T]he first issue I must decide is whether . . . or not this was a custodial interrogation or interview, because if it's noncustodial, *Miranda* does not need to be applied. There are several factors, in fact, the test, and this was very clearly given to us in *State v. Anderson* . . . . [T]he test is rather simple. It's whether a reasonable person in the suspect's position would consider themselves deprived of freedom of movement to a degree associated with a formal arrest considering the totality of the circumstances . . . .

> Well, the first factor they give us to be used in any case is the time of the interview . . . . [I]t seems to indicate that the interview initially began by Detective Harris somewhere on or about 1:00 o'clock in the afternoon. It was never hammered down exactly. Detective Harbaugh, now Special Agent Harbaugh, testified he began his interviews somewhere around 4:00 o'clock or later in the afternoon. But the point is, this was in the afternoon . . . . And this interview did take place sometime between 1:00 and 4:00 in the afternoon and lasted for four hours and fifty[-]six minutes. I feel that works in favor of the State because we do know from later in the testimony that sometime around 9:00 p.m. is when the detectives and special agent went to her home . . . .

> Let's talk about the location of the interview . . . . This interview took place at a hospital. Now, Mrs. Mark is a pediatrician. She even testified under oath, her answers were very evasive, and I'm going to make that notation now, all of her answers on direct and cross examination, very evasive. But she finally testified that, yeah, she's probably been in a

hospital over a hundred times. In this particular hospital, at least three times, and in this hospital at least enough that she recognizes her own parking spot. So, this location is a familiar spot to Mrs. Mark. It's not an inhospitable place. It's a familiar place . . . . [T]he law does require that any trier of fact . . . . that when you decide whose testimony you believe in a particular case, you're to rely on your own common sense and everyday experience. And my common sense and everyday experience tells me that a doctor in a hospital is like a bug in a rug. It's just not an unfamiliar place. It's a place where they should feel relaxed, even under these conditions, but a familiar place. So I think that works in favor of the State.

We next get down to the duration and character of the questioning. I think we need to divide that particular element or that particular factor into two parts. First the duration, now there's no question that this interview, it seems to be, the evidence seems clear, somewhere around a total of four hours and fifty[-]six minutes . . . . Now, the evidence in this case has been rather clear and undisputed that during the first segment of the investigation, perhaps even the first hour, that Mrs. Mark was not even a suspect. That they were actually acquiring background information about Mrs. Mark, her home life and her husband, [whom] we all recognize as a co-defendant in this case. And the question was really directed as to whether or not he might have caused these suspected injuries to this child. It wasn't until after about an hour the evidence seems to indicate that Mrs. Mark actually became a suspect when she started answering questions admitting, in the words of Detective Harris, that -- and testified to that she had actually caused some injuries which were witnessed to this young child. And at that point, as everyone knows from the evidence, that's when Detective, now Special Agent Harbaugh was called because he does, as has been admitted and he admitted on the stand, this is what he does is child abuse investigations.

So, that first hour, particularly, up until Harbaugh arrives, certainly that portion of the statement and the admissions made in that statement, the duration is not overly long. So then we get to the second point when the tape is turned on . . . . So when you look at the first hour and a half, the questioning between Detective Harris and Mrs. Mark, not long at all, one and a half hours. And I particularly find in that part, the duration does meet the requirements of *Anderson*. It was not of a nature that would make the statement [in]admissible.

Then we go to the part where it began recording . . . . I've got it marked here, she would be asked [a] simple question and Mrs. Mark would

-15-

go into a long dialogue answer which would be more information than was asked and she was just allowed to continue to talk . . . . I would also like to note that during this, at least the initial part of the recorded interview as well, she was very unemotional. Questions were asked, direct questions were asked. There were very unemotional responses. Unlike her testimony here on the stand today, the answers came out rather quickly. They were responsive, and as stated, and I think one of the attorneys argued that if she didn't understand a question she would simply say, I don't understand and would you repeat. Which like I stated earlier, much different than her testimony here today where most of her answers were totally unresponsive, even after pauses for reflection they were unresponsive.

So, you get into the entire period of the duration when the recording started, and it was some I think three plus hours. I think we took a break. The first break on the recording was approximately two hours and thirty[-] three minutes. Again, I think it was at that point, at least from the tape it appeared that Mrs. Mark became emotional. But then when the questioning began again she again began giving very responsive -- to the questions. I think what's very noteworthy too, during a lot of the answers, I made a notation, because this talks about the duration and it also goes to the general demeanor, in many of her responses, particularly her colloquy about, you know, when she'd go beyond what the question asked, most of her answers she was -- obviously seemed more exasperated about the nonperformance of her child . . . . In fact, I even made myself a notation, in part of this interview it actually sounded like a mother talking to their grandmother or her mother about the granddaughter. It wasn't like talking to a detective . . . . . So, you know, as far as the duration and the character, I believe that works in the State's favor, that there was nothing in the recorded interview where I thought the duration was necessary -- or was longer than necessary, particularly too, and I need to point this out because I made myself a note. When Mrs. Mark initially became a suspect and started talking about the visible injuries to this child, she started mentioning multiple incidents. It wasn't a single incident . . . . But then during this interview she was talking about various injuries on various dates which occurred in various ways. Well, when you do that that, by necessity, it requires more questions, lengthy questions because you're talking about different events, and that's going to naturally extend the length of the interview than if we were talking just one event and one particular injury.

So, we go down to the next factor listed by the *Anderson* court and that's the officer's tone of voice and the general demeanor . . . . [T]he tape speaks for itself. I listened to the tape . . . . During the times of the

questioning by Agent Harbaugh, this Court saw no occasion to where his voice and his demeanor had got to the point that a reasonable person in a suspect's position, as required by *Anderson*, would feel like they were being pressured other than just the request, look, answer the question honestly, don't guess or don't answer it at all . . . . As far as Detective Harris's tone of voice and her demeanor, I think it's noteworthy that when Mrs. Mark was on the stand at no point, at no point during the direct or the cross examination did she ever dispute anything that Detective Harris testified to . . . . [T]his Court does give credibility to Detective Harris's testimony because there was just no contradictory testimony as to that.

You go down to the next factor, the suspect's method of transportation to the place. . . . She drove herself to the Children's Hospital . . . . [T]hat certainly works in the State's favor.

The next factor, the number of police officers present. Now, at any one time there were at least two police officers in this room, but I think it's important to point out, they were not uniformed police officers. They were in plain clothes . . . . These officers were in plain clothes and they introduced themselves to Mrs. Mark. Yes, they had a badge showing. Yes, they had a gun showing. Well, you know, that's the way police are everywhere. They don't do that to intimidate. They just do it because it's part of their job. And particularly, people in Mrs. Mark's position, an educated doctor, born in New York, has got to understand that . . . . So, I think that works in the State's favor.

Any limitation, the next factor, any limitation on the movement or other form of restraint imposed on a suspect during the interrogation. Well, I think this goes back, Number 1, to the testimony of Detective Harris, which was not controverted, when she did tell Mrs. Mark, no matter what you say today, you're going home, and by God, at the end of the day she went home. And, you know, there's been an issue raised, well, during the break she remained in the room. The officers went out. The officers escorted her down there to see her son (sic). True. I think the facts clearly show that. But, again, Mrs. Mark, she's not – she's not in the police station. She's in a hospital, in a hospital waiting room. There are doctors going by all the time. In fact, you know, on the tape, I know at least on one occasion, a doctor popped in to talk to her and her pastor popped in to talk to her. The door was unlocked. Mrs. Mark testified she came in and out of the hospital at will. Her testimony on the stand today is, well, I was scared. I didn't feel like I could leave. I need the record to reflect, I just don't give her testimony any credibility . . . . I am really bothered by the fact that, you

know, during this questioning, I do -- I do think the evidence shows clearly that she never asked to go see her child. She asked about the condition. She never asked to see her. I think it's also uncontroverted though that during the break she was more concerned about her telephone and asked about her telephone and not the child. I think that all goes to the credibility at this point when she testifies today that the reason that she never walked up and left was because she felt scared. Like I say, using my own common sense and everyday experience in life, the Court doesn't buy that and that works against the Defendant and in the favor of the State.

The next factor, any interactions between the officers and the suspect, including the words spoken by the officer to the suspect, suspect's verbal or nonverbal responses . . . . [T]he taped evidence speaks for itself. I didn't see any interactions in that particular audio tape to where Special Agent Harbaugh, for lack of a better term but, you know, at no point during the interview did he browbeat the Defendant, or Mrs. Mark, or threaten her. His questions were just low key and very direct. And at points during his questioning, his voice might have been a different tone than other tones, but it was at points where Mrs. Mark was evasive or unresponsive. But the tone wasn't overly -- to a point to where I don't think any individual in Mrs. Mark's position would feel like they couldn't at any moment just say, look, I've had it. I'm tired. I want to see my child. I'm done. Particularly someone with her education and experience. I really believe from the overall tone of this entire conversation, this recorded conversation that I listened to for three and a half hours, Mrs. Mark really seemed like a willing participant and sounded like someone that just wanted to try to explain her side of the story and talk her way out of it. That's the impression I got. I even made that particular note, that at no time was she in any hurry to get up and leave, that she was more than willing to ask questions and give answers which she felt were appropriate and she did that by asking her own questions about, well, could the ice pack cause this, could the fall on the mattress have caused this, could this have caused this. So I don't feel like any of the interactions between the officer and the suspect would violate the factors set forth in *Anderson*.

The next factor, the extent to which the suspect was confronted with the law enforcement officers suspicions of guilt and evidence of guilt. They clearly did that. You know, at several points during the interview, they clearly told Mrs. Mark, look, we've talked to the doctors, and your explanation just doesn't fit what the doctors have told us, the extent of the injuries. So there was no deception . . . . I think the officers did properly tell Mrs. Mark their suspicions of guilt, what they felt the other evidence

would show, that they spoke to the doctors, and they wanted to give her an opportunity to explain.

Finally we get to that extent to which the suspect is made aware that he or she is free to refrain from answer[ing] questions or to end the interview at will . . . .  [T]he evidence is uncontroverted that Detective Harris at the beginning of the interview did ask her, I'd like to speak to you. You are free to leave, and if you want to stop talking and get a lawyer and questions will cease.  And no matter what happens here today, you're going home . . . .  [T]hey do meet the requirements of that ninth factor that Mrs. Mark was told that she was free to leave . . . .  Mrs. Mark, like she did when the officers went to the house, and she said, look, I'm tired. I don't want to talk to you anymore, and they broke it off.  She could have just as easily said that and knows she could have said during the interview.  In fact, like I say, when you listen to the interview itself, to the questions and her responses, at that point her responses, even when she reflected on her answers, they were clear, they were concise.  There were no signs of stress or duress.  So, as far as a finding of custody, I find that Mrs. Mark was not in custody during this particular interview, so therefore *Miranda* is not required.

We next get to the voluntariness issue that even though she's not in custody is it possible though, as stated in the motion, was there psychological coercion because the fact that the interview lasted so long and the fact that her daughter was in bad shape down at the end in the hospital room.

Using the same set of rules and the same factors where I found that she's not in custody, that same argument is that, no, there was no involuntariness.  In fact, like I say, from her -- many of her responses, Mrs. Mark went far and beyond the question being asked and volunteered even more information.  And like I say, many parts of this audio tape it was more of a dialogue in which Mrs. Mark actually did most of the discussion.  So at no point do I find during the interview or interrogation or questioning, however you want to characterize it, it is what it is, but I don't feel like that it was involuntary at any point that she was in there in that interview room.  So, motion to suppress the statement is respectfully overruled.

-19-

B.  Facts from Trial[4]

Detective Bonnie Harris was the State's first witness.  She stated that when she and Detective Stolinsky were dispatched to Vanderbilt, she had received information about "suspicious" marks on a little girl's body and "some admissions" made with regard to the child's teeth having been knocked out.  Upon arrival at the hospital, Detective Harris spoke with social worker Alisa Lipton and emergency room doctor Mark Meredith.  She also visited the victim's room and observed that she had a black eye, scarring on her nipples, and bruising on her inner thighs and back.

Detective Harris then described the facts surrounding her questioning of appellant, and her testimony was consistent with that adduced at the hearing on the motion to suppress.  Appellant told her that she and her husband had adopted the victim from China and had returned to the United States with her on April 9, 2010.  Appellant was a pediatrician with Cumberland Pediatrics in Lebanon, and Mr. Mark was a stay-at-home parent and home-schooled the victim and their older daughter.  Appellant told Detective Harris that she found out that the victim "was not what they expected.  She . . . was very tiny for her age[,] and she was not potty trained . . . ."  Because the victim did not speak English, appellant was the only person who could communicate with her as they both spoke Mandarin.  Appellant found the victim's behavior "frustrating" because the victim would not obey appellant but would, in appellant's opinion, use her "cuteness" to manipulate Mr. Mark and avoid punishment.

Detective Harris recalled that appellant told her that the victim "changed" on Father's Day, June 20, in part because her older daughter's birthday was June 19 and, accordingly, received a great deal of attention that day.  Detective Harris then detailed the admissions appellant made with regard to her actions involving the victim's scarred nipples, missing teeth, and bruising.  Appellant described in detail the events surrounding the victim's black eye.  Detective Harris said:

> She stated . . .  it was on Father's Day that [the victim] was acting like she couldn't walk and she fell and bumped her head, and she tried to place an ice pack on [the victim's] head and [the victim] did not want it on her head, so she . . . she held [the victim's] hands together with one hand and took the ice pack in the other hand and slammed it in her face several times.

Appellant stated that the victim was screaming but not crying because "[the victim] never cried."

---

[4]  While the testimony adduced at trial encompasses other disciplinary tactics and behaviors employed by appellant and Mr. Mark toward the victim, because sufficiency of the evidence is not at issue, we will only highlight those portions of the testimony necessary to establish the elements of the offenses.

Detective Harris explained that she called Detective Brian Harbaugh to assist with the investigation. She said that the first segment of the interview was not recorded but that Detective Harbaugh brought a recorder with him to memorialize the later segments. During the second segment of the interview, in addition to "rehashing" the admissions appellant had already made, she was asked about the bruising on the victim's back. Appellant told them that it was "possible that it might have come from where her and her husband would kick [the victim's] back to get her out of the breath holding spells." Appellant also described the sequence of events on the night preceding the victim's hospitalization and death:

> [We] [s]tarted talking about the night of the incident, which was June 30th, that they did go to her daughter's karate class and they arrived back home around 9:30, and [appellant] did go upstairs and wake up [the victim] to get her to get something to eat because she hadn't eaten dinner, and when she did she sat up and at that point she kind of bumped her head on the bed rail of the bed. . . . [S]he was asked if there was any . . . reason that there [were] any injuries or anything like that. She said, no, that she just got up and walked out of the bedroom. They went to the stairs. They started walking down the stairs. [The victim] tumbled down a couple of the stairs and [appellant] said that she caught her and then she rolled -- not rolled, but scooted down on her back a couple more steps. And at that time she looked at her -- [the victim] looked at [appellant] and held her breath, and that [appellant] picked her up and put her back in the bedroom.

When asked about whether appellant discussed interactions between herself and Mr. Mark with regard to her treatment of the victim, Detective Harris testified, "[Appellant] said that she knew what she was doing was wrong but she would lose control."

In relation to the victim's head injury, "[appellant's] first explanation was that -- could it be the ice pack incident, and then on into the discussion, she mentioned the bumping of her head on the bed rail, then she mentioned the bumping of her head on the staircase where she tumbled down a couple of stairs." Detective Harris testified that she persisted in questioning appellant about the victim's head injury because she received information from hospital staff and that she "believed that there was more to it." Appellant eventually offered that the victim's breath-holding spell on the stairs "frustrated" her, so when the victim passed out, appellant picked her up "and walked her up to the guest room and flung her in the bedroom onto the mattress. Before hitting the mattress her head hit the wall." Appellant said it was possible that the victim's head struck the window sill before stating that her head had, indeed, hit the wall. Detective Harris asked appellant what she did next:

She said that she walked over there and rolled her on her side so she wouldn't vomit and swallow the vomit and choke. At that time, I asked her was she making any noise, and she said, no. She said that she went downstairs and watched a movie with her husband, came back a couple of hours later, and checked on her. She was unresponsive.

She said that she rubbed on her chest to try to get her to wake up and she was still unresponsive. She stated that there was some blood and saliva coming out of her mouth so they cleaned it up with a shirt, and actually that night they changed her, still unresponsive, into another shirt, and then they went to bed.

. . . .

She went -- the next morning she woke up. She took a shower. She got her breakfast ready and then she went and checked on [the victim]. She was still unresponsive and there was a little bit of blood and saliva mix coming out of her mouth, so she wiped it again. She carried her downstairs. That's when her husband, Steven, woke up, and she said that she was still unresponsive, so she gave [the victim] to Steven and said, "I have to go to work." So she left him and went to work.

Detective Harris testified that when she left the hospital, a case worker from Child Protective Services ("CPS") was waiting to question appellant about her eight-year-old daughter. Detective Harris then traveled to appellant's residence, where the crime scene unit was collecting evidence. She described her conversation with appellant as she did during the suppression hearing.

Detective Harris stated that evidence from appellant's home was seized and forwarded to TBI for DNA analysis. She confirmed that appellant was not arrested until several days later and that Mr. Mark, appellant's husband, was also charged with several counts of aggravated child abuse.

Detective Harris emphasized that appellant chose in which chair she wanted to sit during the interview and that the detectives did not direct her to a chair on the opposite side of the table from the door.

The State called Detective Brian Harbaugh as its next witness. He stated that he arrived at Vanderbilt Children's Hospital toward the end of his 8:00 a.m. to 4:00 p.m. shift and estimated that it was around 5:00 p.m. He explained that he recorded the interview with appellant without her knowledge because when one informs an individual that they are being recorded, they become "apprehensive" about answering questions.

They "react differently," become "short-worded," and do not communicate well. The recorded interview was then played for the jury. Detective Harbaugh confirmed that the interview had lasted approximately two and a half hours when they took the first break.

Detective Harbaugh described for the jury appellant's demonstration of how she "flung" the victim onto the bed. He said, "She raised both of her hands up here towards her chest, and then we asked her just to go ahead and do exactly the same intensity and force that she did, and she shoved her hands out like that." The remainder of Detective Harbaugh's testimony was consistent with that he gave at the hearing on the motion to suppress.

On cross-examination, Detective Harbaugh acknowledged that appellant, in describing the events of the night before the victim died, stated that as they were walking down the stairs after karate, the victim struck her head when she was falling on the stairs. He denied having spoken with a doctor prior to his interview with appellant but agreed that he learned of the victim's condition from other detectives before beginning the interview. He recalled that during the interview, appellant said that the victim was fine and ate well at breakfast and lunch on June 30 but that she would not eat her dinner. Appellant then told Detective Harbaugh that she then went to karate with her older daughter and upon her return, the victim was in a different condition. Detective Harbaugh stated that he was aware that appellant and/or Mr. Mark had placed a call to the adoption agency and remarked that the victim was a "demon child" but did not recall that it was placed the day before the victim died.

Detective Chris Melvin with the Lebanon Police Department was the State's next witness. He testified that he was asked to assist the Mt. Juliet Police Department by collecting and documenting evidence at appellant's home. Through him, crime scene photographs and physical evidence, including a piece of drywall from appellant's guest room, a crib mattress, and a shirt, were offered and admitted.

Special Agent Forensic Scientist Jennifer Shipman with the TBI crime laboratory was accepted by the trial court as an expert in serology and DNA analysis. She examined the piece of drywall, the crib mattress, and the shirt that Detective Melvin collected and submitted to TBI and found blood and DNA on all three items that matched the victim's DNA to the exclusion of the world's population. On cross-examination, Special Agent Shipman acknowledged that her testing could not determine the date(s) on which the blood stains were deposited on the items.

The State called Rebecca Allen as its next witness. Ms. Allen became acquainted with appellant because both families had daughters the same age, and the daughters had attended kindergarten and had been involved in other activities together. Ms. Allen had adopted two children and shared with appellant some of the struggles they had with

adjusting. When appellant and her family returned from China, they attended a birthday party for Ms. Allen's daughter the following day, April 9. Ms. Allen met the victim at that time, whom she said was "smiling," "very happy," and interacting with the other children to some degree.

Ms. Allen recalled that the next time she saw the victim was at a Girl Scout meeting where Mr. Mark had taken the older daughter. Ms. Allen described the victim as "very quiet" that day but remarked that the victim "hugged" Mr. Mark's legs and called him "Papa," so she thought that the victim was bonding and adjusting well. The next time she saw the victim was at the karate studio. Ms. Allen noticed that she had several bruises on her arm around her wrist and between her elbow and wrist, which she described as "striped kind of bruises."

Ms. Allen said that the next time she saw the victim was at the birthday party of appellant's older daughter. Someone made the victim a plate of rice to eat. It was very hot outside, so Ms. Allen fanned the victim while she ate. She noted that despite the heat, the victim was dressed in long pants and a t-shirt. Ms. Allen opined that the victim took a long time to eat and that "she seemed to chew on the same piece of food over and over like she was having trouble swallowing." Appellant was upset that the victim was taking so long to eat "so she took the spoon and she started to feed her herself and [Ms. Allen] noticed that [appellant] was pinching her wrist, squeezing her arm and telling her to swallow, and [the victim] gagged a little bit but she managed to swallow the food." When appellant noticed that Ms. Allen was aware of her actions, she stopped pinching the victim.

Ms. Allen testified that after seeing the victim at the karate studio, she was concerned about the victim's welfare. Her concerns grew after the birthday party, and she was worried that the family was not "transitioning well with the adoption process." She decided to schedule a play date on July 4 so she could talk with appellant and suggest some resources that the Allen family had used. However, days before the play date, Ms. Allen saw on the news that a child had been air-lifted to Vanderbilt Children's Hospital from the Providence area, and although the child's name was not released, her "heart sank" because she "just knew it was probably [the victim.]" She called Social Services because she did not think it was safe for the victim to return home with appellant, but she subsequently learned that the victim had died.

The State's next witness was Christine Kowal, who knew appellant from the karate studio. She recalled that the first time she saw the victim was at the karate studio. Ms. Kowal saw appellant and the victim, who were already seated, and she walked over to say hello and congratulate appellant. She described, "[Appellant] raised her hand up to me, and . . . in a little bit of a whisper voice she said, '[W]e're starting to find out that

she has some manipulative behaviors so we want to try and control that, so . . . try not to give any more attention to her.'" Ms. Kowal assented and "ignored" the victim that day.

Ms. Kowal testified that at the first meeting, she did not know how old the victim was but that she appeared "very tiny," "shy," and "very quiet." She said that she initially became concerned about the victim when she saw the victim and Mr. Mark at karate one evening, and she "was taken back" by the bruise she saw on the victim's face. She asked Mr. Mark what had happened to the victim. He explained,

> [Appellant] was taking the girls and the dog out for a walk in the neighborhood and [appellant] and the older daughter turned the corner and [the victim] did not follow behind, she strayed away. And by the time [appellant] realized that she was gone, [appellant] turned around, [the victim] showed up and she was bruised.

Ms. Kowal said that "in [her] opinion, the bruises did not match a fall outside." She characterized them as "more extensive." She recalled that the victim "had a huge bruise, hematoma on her forehead. She had two huge bruises and some abrasions on both sides of her cheeks, I do believe at the time. She had bruising on one side of her neck and she also had some bruising on her forearm." Upon arrival at her home, she discussed the situation with her husband because she was concerned that the "story" Mr. Mark told her "did not quite match up to what [she] could physically see on [the victim]."

Subsequently, when she saw the victim again, the victim "was bruised again and [the bruises] were . . . more severe than the first time . . . . [T]he bruises were almost in the exact same place from the first time except one abrasion was covered up with a bandage." Ms. Kowal stated that she saw appellant interact with the victim one time at karate. Ms. Kowal was already seated, and she observed appellant walk in with the victim, pick her up by her arms, "swing" her over the back of a chair, and "slam" her into the seat. At the time, Ms. Kowal thought to herself that appellant had been a "bit rough" with the victim.

The State called Dr. Alice Rothman, an assistant professor of general pediatrics, a general pediatrician, and the medical director of the International Adoption Clinic, as its next witness. Dr. Rothman was offered by the State and accepted by the trial court as an expert in the field of pediatrics. Dr. Rothman examined the victim for a post-adoption evaluation on April 12, 2010. She noted that the victim's height and weight placed her in less than the third percentile of American children and that the victim suffered from "failure to thrive." As part of the evaluation, Dr. Rothman examined the victim's anal area with respect to the surgery she had undergone to correct an imperforate anus. Appellant reported that the victim was not toilet-trained, and Dr. Rothman believed that she was wearing a diaper. Appellant also said that the victim did not seem to recognize

when she needed to urinate or defecate and that the victim often complained of pain when her "bottom area" was cleaned.

Dr. Rothman recalled that an echocardiogram of the victim's heart that was taken in China showed a "buckled aortic arch." She did not perceive such a condition when she listened to the victim's heart, but she scheduled a referral for the victim to have an additional echocardiogram performed. The cardiologist's report indicated that it was a "borderline echocardiogram for age" but stated that it was not likely to be of clinical significance. Further, Dr. Rothman noted a developmental delay related to the victim's gait, which appeared to be unsteady. The records did not contain information with regard to the age at which the victim began to walk.

Dr. Rothman testified that she reviewed medical records from China indicating that the victim's IQ placed her in the range of mental retardation. Dr. Rothman noted in her file that the victim appeared to be transitioning well and that she did not display any unusual rocking or self-soothing behaviors.

Dr. Rothman stated that she performed a "regular" child's physical upon the victim and that the victim had no bruising, scarring of the nipples, broken bones, or missing teeth at the time. Other than during the examination of her anal area, the victim did not appear uncomfortable. Dr. Rothman referred the victim to an occupational therapist in the clinic, who assessed the victim's delays and determined that she was within the normal range of delay of a child who had been in an orphanage.

The State called Tammy Bass, the director of the Nashville branch of Bethany Christian Services, as its next witness. She testified that appellant and Mr. Mark requested a special needs child and that the extent of the victim's special needs was provided to them in their referral. Through Ms. Bass, the State introduced a videotape of the victim that had been provided to appellant. Defense counsel objected to admission of the videotape. Counsel asserted that it was made for the purpose of securing the victim's adoption and that it was in a setting where the victim could be prompted and cued. The trial court reviewed the tape in chambers and redacted certain portions that it deemed to be cumulative. The remainder, however, was ruled to be relevant and probative.

Ms. Bass testified that China required post-placement adoptive visits at the six-month and one year mark but that Bethany mandated a two-week visit. At the two-week visit, appellant and Mr. Mark reported that the adjustment was going better than expected and that the only concern they had was toilet-training. Ms. Bass noted that although the first visit was two weeks after they returned from China, someone from Bethany is always available twenty-four hours a day to respond to questions or concerns. When someone voices a concern, Bethany immediately intervenes to provide support and necessary services. She said that appellant and Mr. Mark were aware of their policy but

that the first contact Bethany had from them indicating a problem was June 30 when Mr. Mark called and said there was a problem. Ms. Bass encouraged Mr. Mark to contact Bethany's post-adoption counselor, but he did not do so. Ms. Bass also spoke to the counselor and suggested that he "reach out" to the Mark family.

On cross-examination, Ms. Bass denied that the video was produced for the purpose of showing the "very best" of a child and encouraging families to adopt. Rather, she explained that it was created "to show an accurate representation of the child because nobody wants a family to get to China and say this isn't what we bargained for." She acknowledged that the victim's adoption file contained a notation that Mr. Mark had contacted their case worker on June 30 and had referred to the victim as a "demon child." Mr. Mark had indicated that since Father's Day, the victim had been engaging in self-destructive behavior such as head-banging, inducing vomiting, and holding her breath to the point of unconsciousness.

Dr. David Lien, a board-certified emergency medicine physician at Summit Medical Center, was offered by the State and accepted by the trial court as an expert in his field. Dr. Lien was working on July 1, 2010, when the victim arrived at 9:44 a.m. The hospital received a call from paramedics as they were en route with the victim advising that they had a pediatric patient who was not breathing, was unresponsive, and did not have a pulse. When the victim arrived, she was intubated, showed no signs of life, and displayed bruises in various stages of healing. Dr. Lien administered epinephrine, which restarted the victim's pulse. He continued resuscitative efforts and contacted life flight so that the victim could be transported to Vanderbilt Children's Hospital by helicopter.

While they were waiting on the helicopter, Dr. Lien ordered blood work and other diagnostic tests. Based upon the victim's body temperature of eighty-eight degrees, Dr. Lien estimated that the victim had been without oxygen for approximately five to six hours. The victim was also anemic, which could have been attributed to many different factors, including blood loss. Dr. Lien stated that he and the staff developed suspicions about the cause of the victim's injuries. He said, "[The victim] had multiple stages of bruising in multiple places – one over the right eye, facial area, and some bruising on the back, bruising on the upper extremity and more so on the lower extremities." He noted that "they appeared to be different phases of bruising and that suggests abuse." He concluded, "In my training, we're definitely told to look for stuff like that." The victim was transported from Summit at 10:25 a.m. on July 1.

On cross-examination, Dr. Lien acknowledged that the victim was underweight for her age and that malnutrition could have contributed to her anemic condition.

The State's next witness was board-certified pediatric hospitalist Dr. Paul Hain with Vanderbilt Children's Hospital, who was accepted by the trial court as an expert in

pediatric medicine. Dr. Hain was working when the victim arrived at Vanderbilt by helicopter on July 1. He stated that upon arrival, the victim was in critical condition. The intensive care doctor led the victim's care team, but Dr. Hain consulted to "help them understand what [the] constellation of injuries meant and if they should be concerned that they were a result of something nonaccidental."

Dr. Hain testified that when he first saw the victim at 4:30 p.m. on July 1, she was intubated, was being administered medication to keep her blood pressure elevated, and was unresponsive. The victim also presented with "blown pupils," which results when one's brain swells from an injury, exerting pressure on the optic nerve and causing the pupils to stop reacting. Dr. Hain reviewed all of the imaging studies that had been conducted and noted multiple posterior and lateral rib fractures in various degrees of healing. He noted that because the ribs are protected by muscles in the back or posterior location, it is very difficult to "hit" a rib in the back and break it. He continued,

> In fact, the only way we really know that you get these rib fractures in the back [is] by squeezing them. So when you see posterior rib fractures in a child, this is an extremely concerning event because what it means is that someone with strength and coordination has placed their hands on this child and squeezed so hard as to snap the ribs where they come around through the back of the rib cage. And you can see these snapped ribs at the hands of an adult in different stages of healing, which means this didn't happen once, this happened on multiple occasions.

He said that the oldest fracture dated back approximately two months and that the newest fracture was less than seven days old. He counted nine rib fractures in all.

Dr. Hain stated that the type of injuries the victim had "would obviously" cause the intensive care staff to be "very suspicious that something had happened to this child that was not accidental." A skeletal survey, or an x-ray of every bone in the body, was ordered to ascertain if there were any other fractures. The results indicated a widening in the coronal sutures, the areas where the unfused bones of the skull were supposed to meet, which indicated that the brain had swollen to such a degree that it was starting to separate the bones of the skull. He noted a healing metacarpal, and the position of the break indicated that the victim had her hand hit by something while it was "in an outstretched position." He characterized the break as "highly unusual." Dr. Hain described two healing fractures of the victim's left ulna, or forearm.

With regard to the victim's head injuries, Dr. Hain explained that the victim suffered diffuse anoxic brain injury, which was an "all-over" injury involving lack of oxygen. He said that one could not live longer than a day after suffering such an injury but that life-sustaining functions could continue. However, soon after the injury

occurred, one would become "very obviously not functional." The ICU doctor performed a brain death examination on the victim that indicated no respiratory drive, no corneal reflex, and no response to stimuli. The victim was essentially brain dead at that time.

Dr. Hain identified a photograph of the victim and noted her black eye, stating that it was an unusual injury for a toddler to have sustained. When asked if a fall in which the victim struck her head on a bedrail could have caused the brain injury, Dr. Hain answered that it was enough to cause a bruise but that "we know . . . that children fall and they hit their heads and they don't die of brain swelling with a traumatic head injury in an intensive care unit . . . . Children just don't slip and bonk their head on something and have their entire brain come apart and swell and die . . . ." He said that the sort of brain injury the victim suffered required "more force than anyone would think," such as a fall from a second- or third-story window or involvement in a high-speed automobile accident. When asked if throwing the victim into a wall could have caused the injury, Dr. Hain stated, "So to be thrown into a wall, to have this cause your brain to swell up catastrophically and for you to die, I mean, she was hurled into a wall if that was actually the mechanism."

Dr. Hain said that bruising on the victim was also noted. He clarified that one might expect to see bruises on the forehead or forearm of a child but that bruising between the shoulder blades, such as the victim had, could only be caused by "infliction" of the bruises. He did not note any physical condition of the victim that would have caused her to bruise easily. He opined that she did not suffer from brittle bone disease and noted that her bones appeared to be normal when he viewed the films. Dr. Hain explained that before a patient can be pronounced brain dead, there must be two separate brain death exams, separated by time, performed by two different doctors. That was done in the victim's case, and she was pronounced brain dead on July 2, 2010.

Dr. Hain testified that the victim died as a result of nonaccidental trauma. He expounded,

This child was deliberately injured by someone with the strength and coordination of an adult. And when you think about the number of fractures, which is in the teens, and the bruising in places she shouldn't be bruised, this child wasn't just abused once. This child was abused over the course of time, multiple times, painful skin issue, painful broken bones, never brought to medical attention. This child was tortured and then killed.

On cross-examination, Dr. Hain was asked if he thought the victim had been malnourished. He opined that in malnourished children, the last body functions to be preserved were bone growth and brain growth. That is, those are the last functions to be affected by malnutrition. Based on the relative health of the victim's bones, he answered

"actually pretty definitively" that even if the victim had been malnourished, that condition did not affect her bones.

The State called Dr. Thomas Deering, a forensic pathologist, as its next witness. He was tendered by the State and accepted by the trial court as an expert in his field. He testified that the victim was pronounced dead on July 2, 2010, at 11:48 a.m. and that he performed the autopsy on July 4 beginning at 10:00 a.m. The overall "heading" of his autopsy report was that the victim suffered "multiple acute and chronic blunt trauma injuries." He further subdivided his report into several areas.

With regard to the victim's head, Dr. Deering noted a right periorbital hemorrhage, or a black eye. He listed blunt trauma to the four lower incisors with a "healing laceration of the gum line." He described a subgaleal hemorrhage to the top of the head, or a "scalp hemorrhage." He also explained that there was a separation of the sagittal and left coronal sutures of the skull. Those are places where multiple bones would grow together and eventually seal, but the victim's brain expanded to such a degree that it split the sutures, causing them to widen again. The victim had a large subdural hemorrhage spanning both sides of the brain and along the spinal cord, which Dr. Deering attributed to blunt force trauma. Dr. Deering found "extensive" brain edema, or swelling. He opined that in this case, the blunt trauma not only damaged the dura, it also damaged the victim's brain, causing it to swell. He noted bilateral optic nerve sheath hemorrhages without retinal hemorrhages, which would rule out "shaken baby syndrome" and would point toward an "impact" injury where either something struck the victim's head or the victim's head struck an object.

Dr. Deering testified that the next category of injuries involved the victim's chest. He noted several scars on the victim's chest, concentrated around her nipples. He described multiple calloused rib fractures located in the victim's back and on both sides. He stated,

> It's very difficult to fracture a kid's ribs because they're just a lot more flexible than an adult's are. In particular, when I see rib fractures that are posteriorly located, that's very, very difficult to do from something accidental. So I'm concerned about these. The fact that there were multiple rib fractures and that they were on both sides is concerning to me.

Further testing revealed that the some of the fractures were from different events ranging from one week old to six weeks old and that some of the fractures were sustained at the same time. He said that absent a "story" about an event such as a car wreck, he surmised that the rib injuries could have been inflicted by an adult squeezing the victim with such tremendous force as to fracture the ribs. Finally, he noted bruises on the right and left side of the victim's middle back.

Dr. Deering described three linear healed round lesions on the back of the victim's left thigh. He posited, "[They] may be healing abrasions or even healing burn marks. And the reason I say that is because they're round . . . . I don't know what they were originally. They're scars now and they're healed, and they're a little unexpected. I don't know what they would be from." Dr. Deering found bruising at the base of the victim's right thumb and right third finger. Finally, he noted a healing fracture to the left ulna, which he estimated to have occurred six to eight weeks earlier.

Dr. Deering opined that the cause of the victim's death was acute and chronic blunt force trauma and that the manner of death was homicide. He added, "The pattern of the chronic injuries with the now fatal acute injury to the brain suggests a pattern of ongoing child abuse, battered child syndrome." He stated that after examining the victim's x-rays, he did not observe any disease such as brittle bone disease or vitamin deficiency that could have accounted for the victim's broken bones. With regard to the amount of force necessary to have inflicted the victim's fatal brain injury, Dr. Deering testified:

> In this particular case, to cause this amount of injury to a brain requires a moderate amount . . . of force and probably a fairly severe amount . . . . I think the impact site is over the back of the head. It may be rather a broad impact site, and by broad, floor, wall, a seat . . . [N]ot an object like a bat or a fist, but something where the striking force is spread out over a broad area.

> As this was experienced by the child, she would not be normal after this. She would have some kind of neurologic defect. That doesn't mean that she would be immediately unconscious. I can't predict that from the injury, but she would not be normal anymore . . . .

> [T]he measure of how severe this is, well, it killed her. I would expect that this would progress rather rapidly and eventually she would come to a point where she was no longer conscious. But that's not necessarily immediately so, but she would not be normal at the point of which this was inflicted.

On cross-examination, Dr. Deering confirmed that the victim's missing teeth had, in fact, been "baby" teeth and that they had not been broken. He agreed with the hypothetical in which the victim had been injured while appellant was at karate and began to show neurological symptoms such as stumbling on the stairs when she returned. On redirect examination, Dr. Deering agreed that with the severity of the victim's injury, unconsciousness could have resulted immediately.

Upon this evidence, the State rested its case-in-chief. The defense presented as its first witness Dr. James Walker, a forensic neuropsychologist, who was accepted by the trial court as an expert in neuropsychology. He testified with regard to "the phenomenon" known as false confessions in which a person admits to a crime that they did not actually commit. He stated that this was an area of "intense study and scrutiny" for him. Relevant to false confessions is the personality trait of suggestibility, which can be quantified using the Gudjonsson test. Dr. Walker testified that outside of one's suggestibility, police tactics also precipitated false confessions. He said that police are trained to elicit confessions by utilizing the following interrogation practices: isolating the subject; keeping them in a room surrounded by symbols of authority such as badges and guns; telling the subject that you know they are guilty and that this can all be over when they finally admit their guilt; telling the subject that they are not a bad person and that the officer understands they did not mean to do what they actually did; telling the subject that if they will just confess to what they are accused of, then everything will go much better for them. Dr. Walker said that some people falsely confess because of deference to authority. Others confess falsely because of sleep deprivation, depression, or anxiety. Still others do so to protect loved ones.

Dr. Walker recalled that when he met appellant, he found her to be "exceptionally pleasant" and she seemed to be "a very kind, gentle person." She was "incredibly deferential" to Dr. Walker, was "alert, oriented," "bright," "articulate," and "also very eager to please." He remarked that appellant was Asian-American and that an important part of that culture was respect for elders and respect for those in positions of authority.

During his evaluation of appellant, Dr. Walker considered investigators' notes and administered the Greens Word Memory Test. The Greens test assessed the individual's truthfulness, and he said that appellant performed perfectly, indicating that she was trying to do her best. He also administered a Mini Mental State Evaluation to determine whether appellant's basic mental functions were intact. The test showed no mental dysfunction. Appellant's scores on the Personality Assessment Inventory were mostly within normal limits, but in some areas, her scores were elevated. On the Positive Impression Management Scale section, she answered some items in a defensive way, such as whether she would become angry when insulted or when someone forgot to empty the trash. Dr. Walker said, "She tended to say that she didn't do things like that, like a typical person would." Appellant scored "low dominance" on the inventory, which indicated that she was nonconfrontational, avoided conflicts, and felt she had lower self-esteem than others. He opined that those characteristics would make a person more likely to admit doing something she had not done. Dr. Walker administered an EQI to obtain appellant's emotional rather than intelligence quotient. The results indicated that appellant had low self-esteem, did not hold herself in high regard, and felt as though she was never able to achieve as her family expected. He said appellant is empathetic,

sympathetic, compassionate, deferential, and unlikely to assert herself. He described that she had a great deal of social responsibility, was a rule-follower, and was not a good problem solver. She does not think "well on her feet," and it would take her longer and require more effort for her to solve a challenge. Appellant described herself as "a rather unhappy individual."

Dr. Walker also utilized the Gudjonsson Compliance Scale and the Gudjonsson Suggestibility Scale. The results of the compliance scale indicated that appellant answered all twenty questions in the "compliant direction." He said, "She described herself as an extremely compliant individual, someone who never goes against authority." The suggestibility scale was "designed to get at the heart of this idea of suggestibility. And it's done by directly measuring whether or not you can get the patient to change their mind about something that they know is actually true." When asked leading questions about a passage that Dr. Walker read, appellant answered affirmatively to those questions at a level that was "higher than average." On the next part of the test in which Dr. Walker challenged some of appellant's answers, she changed her answers eight times, "which is a very high number." He said,

> She's a very suggestible person. She's very compliant. When I gave her the false feedback that she had done very poorly on the test and we should try to do better the next time, she appeared so crest fallen it was almost like I had slapped her across the face. She was just so mortified that she had not done a good job and she wanted to do better. I think that's why she changed her answers on this test.

> With regard to appellant's interrogation, Dr. Walker opined:

> I think that her interrogation by the police was of course as it would be with anybody, a very stressful time. But for [appellant] it was especially stressful because she was confronted by people in authority who wanted her to say things that she did not want to say, who wanted to get her to say that she had done the things that she didn't want to say that she had done. This was a tremendous dilemma for her.

He stated that based on Detective Harbaugh's interrogation techniques, the size of the room, the number of people in the room, the lack of windows, and the location of the exit, in conjunction with appellant's predispositions, she was "very susceptible" to making a false confession on July 1, 2010.

On cross-examination, Dr. Walker stated that he interviewed and tested appellant twelve days prior to the trial in this matter, and he confirmed that she had given a "very damaging confession." He admitted that he was unaware of the adoption paperwork

appellant and Mr. Mark had completed wherein they wrote that although they were Chinese, they did not have a "strong grasp" of the Chinese culture. He acknowledged that appellant had portrayed to him that she, in fact, had a strong tie with the Chinese culture. Dr. Walker agreed that it was a fair assessment that appellant "thinks ahead" when answering questions.

The State asked Dr. Walker whether he had an opinion about whether appellant's statement to the police was true, to which he answered, "I do not." He clarified, "Not within a reasonable degree of scientific certainty." He agreed that it was "very possible" that she was telling the truth in her statement.

After the defense attempted to call Steven Mark, who exercised his Fifth Amendment right to not testify, appellant called Detective Stolinsky as its next witness. Detective Stolinsky testified with regard to his interview with Mr. Mark. He recalled that at one point on July 1, they drove to the Mark residence, and Mr. Mark typed his own statement for Detective Stolinsky. Mr. Mark wrote about an incident wherein he placed the victim in a box in the garage as punishment and that he feared the victim might suffocate. He would also place the victim in a dark closet as a form of punishment. He recalled the victim's habit of holding her breath until she lost consciousness and said that she would remain unconscious sometimes for one to two hours. During one of her episodes, he attempted to pry her mouth open with a toothbrush, and in doing so, he knocked out some of her baby teeth. Detective Stolinsky testified that Mr. Mark applied heating pads to the victim's legs to assist with circulatory problems and that he burned the victim's skin by doing so.

On cross-examination, the State elicited that none of the forms of punishment that Mr. Mark mentioned involved bruising or broken bones.

Appellant also presented as character witnesses medical personnel with whom she had worked, the parents of patients whom she had treated, and a fellow church member.

Upon this evidence, the jury deliberated and found appellant guilty of first degree felony murder committed during the perpetration of aggravated child abuse, four counts of aggravated child abuse, and four counts of child abuse. The trial court sentenced appellant to life imprisonment for the felony murder conviction and conducted a sentencing hearing on the remaining convictions.

C. Sentencing Hearing

At the sentencing hearing, the State called Cheryl Jackson with the Tennessee Board of Probation and Parole as its first witness. Ms. Jackson prepared appellant's presentence report. She noted that appellant had no criminal history.

The trial court began its ruling by considering the mitigating factors advanced by appellant, beginning with factor (7), that appellant was motivated by a desire to provide necessities for her family or herself. Tenn. Code Ann. § 40-35-113(7). The trial court concluded:

> Under no set of circumstances can any person, particularly a parent, repeatedly abuse a child, that abuse being to such an extent that after certain repetitions it results in the child's death. That cannot ever be considered a desire to provide a necessity for . . . for the Defendant's family or the Defendant's self.
>
> It's an absurdity to think that any person, particularly a parent, can abuse a child, . . . to cause cracked ribs, serious bodily injuries which ultimately resulted in the child's death, and these were intentional acts to provide for the necessity of the family. So I specifically find that that mitigating factor, Number 7, does not apply.

With regard to the mitigating factor that appellant assisted the authorities in uncovering offenses committed by Mr. Mark or in detecting or apprehending other persons that committed the offenses as contemplated by Tennessee Code Annotated section 40-35-113(9), the trial court reasoned:

> She was not interested at all in helping the State of Tennessee uncover criminal activity. Her only desire, her only motivation in giving these statements and doing any participation was to help herself. That's very clear from the motions, from the testimony at the suppression hearing and the testimony at trial.
>
> So, the fact that the police officers were very adept and very trained and very good at developing this information, she doesn't get credit for that because that was never her motivation. That was never her intent. That was never her desire. So, I do find that that particular mitigating factor, which is a statutory factor, going back, Number 9, has absolutely no application.

Appellant advanced factor (11) but modified it to simply read that she although guilty of the crime was acting under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. *Id.* § 40-35-113(11). The trial court stated:

I also find that that mitigating factor does not apply because in this particular case the proof is clear, we had a sustained intent. We had, as I recall from the proof, eighty three plus or minus days of continual constant abuse, and they were intentional acts. I remember the proof. I made notes of the proof, the twisting of the nipples, the slapping of the hands, the throwing of the child against the wall.

The proof is there was sustained intent to abuse this child until what happened ultimately happened, the death of a child. I mean, there was no other end coming. It was the only logical resolution of what was going on in that household. So, I do find that that mitigating factor does not apply.

Under the "catch-all" provision, *see* Tenn. Code. Ann. § 40-35-113(13), appellant advanced that her social and ethnic background greatly contributed to her actions. The trial court declined to apply this factor, concluding that "there was absolutely no proof that her social and ethnic background contributed to her actions because there was absolutely no proof that people of her culture and background abuse children until they die."

The State relied upon Tennessee Code Annotated section 40-35-114(5), that appellant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense. Finding this enhancing factor applicable, the trial court surmised:

So how do you define exceptional cruelty. Well, the only thing I've got left is to look back at the proof at trial. As Mr. Lowery correctly stated, I cannot use the event itself to establish exceptional cruelty. I must go beyond that.

There's proof in this case that goes beyond that. See, this child suffered not only at the time the injury was committed but she suffered twenty[-]four hours a day, seven days a week. Mr. Lowery did bring up the emotional cruelty part, that I can take a further step. I can find this if I look at emotional cruelty.

Like I said, the only person that can testify to that, she's not with us anymore. But, given the facts of this case, the nature of the injuries, the scarring, the bones that were trying to heal, what's going through that little girl's mind everyday, that her own adoptive mother has broken her bones, crushed her body.

Do we not know as being parents, all of us in this room, knowing the human body, that there is a large degree of emotional pain that goes along with that, with that constant pain. I think we can. I think certainly we must do that. So I do find that enhancement factor Number 5 applies.

The State asserted that factor (6), that the personal injuries inflicted upon the victim were particularly great, applied to the case. *Id.* § 40-35-114(6). The trial court considered this factor and in concluding that it applied, stated, "I cannot use the injury itself . . . to enhance within the range. But it does use the term, particularly great, and in this case it goes beyond particularly great. In this case it ends in death. . . . There is no greater injury."

The trial court also found that appellant abused a position of private trust in committing the offenses. *Id.* § 40-35-114(14). The court determined that appellant should be sentenced to the middle of the applicable range for all of her convictions and imposed sentences of twenty years each as a Range I, standard offender at one hundred percent release eligibility for the four convictions for aggravated child abuse and three years each as a Range I, standard offender for the four convictions for child abuse.

In considering appellant's sentence alignment, the trial court stated:

Using that application that consecutive sentencing would be proper, of course, that statute specifically says, the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk to human life is high.

Of course, I have looked at the standard and I think the defense did an excellent brief on this point because, you know, it is always a good reminder to the Court as to how that standard is to be applied, and it tells this Court what is necessary above and beyond the particular events which will require consecutive sentencing.

I think I was sort of looking at the last term we had, exceptional cruelty. You know, dangerous offender, is also I think a term of art. You know, it's always constant to interpretation, definition as the circumstances change. And so we ask ourself, what is a dangerous offender. And I think I stated earlier, you know, what can be more dangerous to society, what can be more dangerous to civilization than a failure to protect those that we're given a duty to protect, particularly our children.

A parent who would kill their child is the poster child for a dangerous offender. Their picture should be in Webster's Dictionary

beside the words, dangerous offender. So there's no question in this Court's mind that Mrs. Mark does meet the definition of a dangerous offender.

The second part of that test though is, is even though she's found to be a dangerous offender, does consecutive sentencing serve any valid state purpose, particularly in this particular case for which she's serving a life sentence. I think certainly it does because, you see, children are part of the state and children need to know, as well as their parents and everyone else, that they will be protected, and that crimes against our children are the most serious of all crimes.

In fact, there's a statute we have on aggravated child sexual abuse which specifically calls for consecutive sentencing in those appropriate situations. Our legislature in making a notation that this is a one hundred percent offender has made a determination that this is one of the most serious, if not the most serious, of all offenses. The legislature has decided that.

So I think that consecutive sentencing in this particular instance does serve a valid state purpose and does meet the requirements of the statute.

Accordingly, the trial court aligned each of appellant's twenty-year sentences consecutively to each other (Counts II, III, IV, and V) and consecutively to her life sentence (Count I). It aligned her three-year sentences (Counts VI, VII, VIII, and IX) concurrently with each other and concurrently with Count II but consecutively to Count I, for an effective sentence of life plus eighty years.

It is from these judgments that appellant now appeals.

## II. Analysis

Appellant raises five issues for our review: (1) whether she was in custody when she was questioned by law enforcement officers, thereby necessitating an advice of rights pursuant to *Miranda v. Arizona*; (2) whether her statement was coerced and involuntary; (3) whether the trial court erred in admitting into evidence a videotape of the victim that was prepared by the victim's adoption agency to show to prospective adoptive families; (4) whether the evidence was sufficient to sustain appellant's conviction for Count III of the indictment, aggravated child abuse, based on appellant's knocking out four of the victim's primary teeth; and (5) whether the trial court erred in imposing partial consecutive sentences.

## A. Custodial Interrogation

Appellant challenges the admission of an audio-recorded interview obtained by Detective Harbaugh. As an initial matter, we must determine the appropriate standard of appellate review. Relying on *State v. Dailey*, 273 S.W.3d 94, 100 (Tenn. 2009), appellant urges this court to conduct a *de novo* review of the trial court's findings of fact with no presumption of correctness attending the court's legal conclusions.

When reviewing a trial court's ruling on a motion to suppress, we will uphold the trial court's findings of fact unless the evidence preponderates to the contrary. *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "But when a court's findings of fact at a suppression hearing are based solely on evidence that does not involve issues of credibility, such as . . . videotape evidence . . . , the rationale underlying a more deferential standard of review is not implicated." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). When a trial court bases its findings of fact solely on evidence that does not involve issues of credibility, appellate courts are equally as capable to review the evidence and draw its own conclusions. *Id.* In such a case, the appellate court must conduct a *de novo* review and attach no presumption of correctness to the trial court's findings of fact. *Id.*

As appellant points out, this court was provided the audio-recorded statement as an exhibit in the appellate record, and we are equally as capable as the trial court of forming our own conclusions. However, appellant overlooks the fact that Detective Harris testified that she advised appellant, both before the initial unrecorded interview and before the recorded interview, that her participation was "completely voluntary[] [and] that she was free to leave at any time." Detective Harris said, "I pointed to the door. I said, '[T]here's the door.' I told her that the only reason why the door was shut was because of privacy issues because it was a hallway. The waiting room was right off the hallway and there was a lot of foot traffic." She further informed appellant that she was free to leave; that she was free to cease answering questions; that she was free to request an attorney, at which time they would stop the interview; and that regardless of what appellant told her in the interview, "she would be going home that night." These statements by Detective Harris were not recorded by Detective Harbaugh's tape; however, they were relevant to the trial court's determination of whether *Miranda* warnings were required. Because the trial court relied on Detective Harris's testimony and credited it, we must apply the more deferential standard of review to this case. We also note that the party who prevails at the suppression hearing is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Bishop*, 431 S.W.3d 22, 35 (Tenn. 2014).

For the merits of this claim, relying on *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), appellant argues that she was in custody when the officers extracted the statement from her because "under the totality of the circumstances, a reasonable person in [her] position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." The State asserts that the trial court's ruling on appellant's motion to suppress was correct.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself [or herself]." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody, that is, he has been taken into police custody "or otherwise [has been] deprived of his freedom of action in any significant way," the police must first inform him of his Fifth Amendment rights for any subsequent confession to be admissible as substantive evidence against him in the trial of the matter. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The United States Supreme Court made clear: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A suspect may affect a voluntary, knowing, and intelligent waiver of his or her rights. *Id.*

The requirements of *Miranda* "must be strictly enforced, but only in those situations in which the concerns that motivated the decision are implicated." *State v. Goss*, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998) (citing *Illinois v. Perkins*, 496 U.S. 292, 296 (1990)). However, *Miranda* warnings are not required in every situation in which police-citizen contact occurs. *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001). Rather, because the purpose of *Miranda* is to "'dissipate the compulsion inherent in custodial interrogations, to prevent coerced self-incrimination, and to prevent relevant defendant ignorance,'" *see State v. Callahan*, 979 S.W.2d 577, 582 (Tenn. 1998), *Miranda* warnings are only required when a suspect is in custody and is subjected to questioning or its functional equivalent, *see Rhode Island v. Innis*, 446 U.S. 291 (1980). *Walton*, 41 S.W.3d at 83. "Absent either one of these prerequisites, the requirements of *Miranda* are not implicated." *Id.*

While the inquiry of whether one is in police custody is somewhat objective, the question of whether one has been "deprived of his freedom of action in any significant way" is rather amorphous. As such, our supreme court has emphasized that the proper test is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). The *Anderson* court listed the following non-exhaustive objective factors to be considered assessing the totality of the circumstances:

- the time and location of the interrogation;
- the duration and character of the questioning;
- the officer's tone of voice and general demeanor;
- the suspect's method of transportation to the place of questioning;
- the number of police officers present;
- any limitation on movement or other form of restraint imposed on the suspect during the interrogation;
- any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses;
- the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt;
- and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* The court reaffirmed the discretion given to the trial courts in ruling on this issue, noting that the trial courts are "especially suited" to applying the appropriate factors to the facts of a particular case. *Id.* Moreover, "[t]he test is objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." *Id.* We will address each *Anderson* factor in turn.

*Time and Location of Interrogation*

Appellant's interview took place in the afternoon hours in a hospital waiting room. As a physician, the hospital was certainly a familiar place to her. In fact, when she discovered that her cellular telephone was missing, she easily described her assigned parking place to Detective Harbaugh. The trial court found that "common sense and everyday experience tells me that a doctor in a hospital" would be comfortable, even under such circumstances, and that it would be a hospitable and familiar place. The evidence does not preponderate against these findings. This factor enures to the State's benefit.

Notably, all of the cases upon which appellant relies found a custodial interrogation when the questioning took place at a police station or detective's office. *See Anderson*, 937 S.W.2d at 852; *Dailey*, 273 S.W.3d at 97; *State v. Chadwick*, No. M2009-01205-CCA-R3-CD, 2010 WL 933640, at *1 (Tenn. Crim. App. Mar. 16, 2010). She cites no authority in which this court or our supreme court has found deprivation of freedom associated with a formal arrest in a location other than a police department.

*Duration and Character of the Questioning*

To fully comprehend the nature and duration of appellant's interview, a timeline of the events of July 1, 2010, is helpful:

1:00 p.m.(approximately):   Appellant's first (unrecorded) interview begins
(Detective Stolinsky's testimony at suppression hearing)

2:00:   Appellant makes first admission/Detective Stolinsky leaves the interview room
(Detective Harris's testimony at suppression hearing)

2:15:   Detective Stolinsky returns, requests a break
(Detective Harris's testimony at suppression hearing)

Detective Stolinsky asks appellant to visit the victim with him
(Detective Stolinsky's testimony at suppression hearing)

3:00 (approximately):   Detective Harbaugh arrives[5]

Interview resumes

3:12:   (twelve minutes into the interview) appellant asks about the victim's condition

3:16:   (sixteen minutes into the interview) Detective Harbaugh leaves the room to obtain information about the victim's condition

5:33:   (two hours, thirty-three minutes into the interview) Detective Harbaugh suggests a break, offers appellant water, a cup and ice for her soda, a sandwich; says he will try to find a doctor to speak with her

5:36:   (two hours, thirty-six minutes into the interview) appellant asks if someone could look for her cellular telephone in the parking garage

6:01:   questioning resumes

---

[5]   Detective Harbaugh testified at the suppression hearing that he arrived at the hospital between 3:00 and 4:00 p.m. Considering his estimation in conjunction with the approximations provided by other detectives, it is more likely that he arrived earlier rather than later.

| | |
|---|---|
| 6:15: | appellant asks if she can have people in the room to offer her support, and Detective Harbaugh says that she can |
| 6:19: | Dr. Hain enters the room and reports that the victim was nonresponsive to the first brain death test |
| 6:20: | Detective Harbaugh offers to summon appellant's pastor from the waiting room |
| 6:26: | Detective Harbaugh leaves, brings CPS worker in to speak with appellant |

The trial court concluded that the duration of appellant's interview was four hours and fifty-six minutes, including breaks, based on a statement by Detective Harris that the first segment of the interview lasted around one hour, fifteen minutes to an hour and a half. The second interview was clearly three hours and twenty-six minutes, including breaks. Considering the break between the first interview and the second interview, we conclude that the evidence does not preponderate against this finding of fact. Any error in the estimated arrival time of the officers or the beginning of interview times is immaterial; the trial court credited Detective Harris's testimony regarding the length of the initial interview, and the recorded interview is uncontroverted. However, we note that in reviewing the timeline, it is clear that at least an hour represents breaks in questioning, reducing the time of active involvement with law enforcement officers to approximately four hours. Appellant herself agrees that what she characterizes as a "leading 'manual' on police interrogation techniques" would find that "[a] properly conducted interrogation that lasts 3 or 4 hours, for the ordinary suspect, is certainly not so long as to cause the levels of emotional or physical distress that constitute duress." The record belies appellant's contention that she had been interviewed for four hours *prior to* Detective Harbaugh's recorded interview. Indeed, appellant's own testimony at the hearing on the motion to suppress contradicts this interpretation; when asked at the hearing if she knew how long she was in the interview room that day, counsel prompted, "If I told you it was close to five hours would that sound somewhere about right?" to which she responded, "I believe so, yes. I believe so, sir." That is consistent with the trial court's finding that the *entire* interview was four hours and fifty-six minutes, from Detective Harris's first question until the culmination of the last interview, and is far afield from appellant's contention in her brief that she was interviewed for over four hours before Detective Harbaugh began his interview.

As to the character of the questioning, this court has listened to the recording and agrees that the tone was not accusatory at all. During the interview, Detective Harbaugh

stated that some of appellant's actions toward the victim were clearly wrong and suggested that she receive counseling or anger management, but he never accused her of child abuse or intentionally injuring the victim. It should also be recognized, as the trial court did, that the first hour of Detective Harris's interview with appellant focused on obtaining background information; appellant was not even a suspect at that time. Appellant did not make the first admission to Detective Harris until the first hour had elapsed. It was at this time that Detective Stolinsky left to call Detective Harbaugh for assistance. The interview did not turn "interrogative" until after that point. This factor favors the State.

Appellant makes much of the fact that the officers were armed, asserting that it was an "entirely avoidable show of force." However, our supreme court, in simply noting that an officer was armed during an interview, stated that it was to be expected, "of course," that on-duty officers would be armed. *Dailey*, 273 S.W.3d at 103. We would add that the officers traveled from their home duty stations to downtown Nashville. Without question, they should be armed as they traverse from one place to the next, and to leave their weapons in a vehicle would not have been advisable as a practical matter.

*Officer's Tone of Voice and General Demeanor*

The officers all described the tone of the interview as pleasant and "conversational." The trial court agreed, as does this court after having reviewed the recording. This factor weighs in favor of the State.

*Appellant's Method of Transportation*

Appellant was already at the hospital when questioned by law enforcement officers, and despite officers' offer to drive her home, she either drove herself home or was driven by someone else. This works to the State's benefit.

*Number of Officers Present*

Although two officers were present in the room, Detective Harbaugh was the primary examiner; Detective Harris questioned appellant during a short time when Detective Harbaugh left the room, and she occasionally asked follow-up questions. This was not a situation where officers "tag-teamed" appellant.

The officers' questioning of appellant in this case is in stark contrast of the interrogation that transpired in *Dailey*, wherein officers took turns peppering the defendant with questions until he ultimately relented and confessed. Such was not the

tone in appellant's interview. *Dailey*, 273 S.W.3d at 98-99. This factor does not benefit appellant.

*Limitation on Movement or Restraint Imposed on Appellant*

A diagram of the waiting room where appellant was questioned was entered into evidence at trial. Detective Harbaugh sat at a table with his back to the door, Detective Harris sat at the end of the table, and appellant sat on the far side of the table facing the door. Although counsel made much of the fact that appellant would have to pass by both detectives to exit the room, it was established that she chose the seat herself; she was not directed to a particular chair in the room. Moreover, she was told by Detective Harris prior to both interviews that she was free to leave any time.

Appellant stresses that the interview room was small and windowless and that the door was closed and that the room was "dominated" by police presence the entire time. Detective Harris very clearly explained to appellant that the reason they closed the door was for privacy; the area outside housed the nurses' station and encountered a great deal of foot traffic. Because of the noise, they closed the door to be able to speak privately. This factor does not adversely affect the State.

*Interactions between Officers and Appellant*

The content of the interviews is fairly straightforward. However, appellant seeks to argue the negative implication that if Detective Harris twice informed appellant that she was free to leave and free to cease answering questions but that Detective Harbaugh did not give such admonitions, then the natural and probable conclusion was that she was no longer free to leave.

We decline to adopt this position. Detective Harris testified that she again informed appellant of her right to stop the interview prior to the second segment's beginning. The second segment began immediately thereafter. Hence, there was no lapse in time during which appellant could have formed this "negative implication." Despite appellant's argument, this factor weighs in favor of the State.

*Extent to Which Appellant Was Confronted with Evidence of Guilt*

The trial court found that at several points during the interview, officers "clearly" informed appellant that they had spoken with the treating physicians and that appellant's explanations for the victim's injuries "didn't fit" the extent of the injuries. The court concluded that there was no deception on the part of the officers and that they properly conveyed their suspicions of guilt and the information that they had received from the

doctors. Officers also gave her an opportunity to explain the victim's injuries. The evidence does not preponderate against these findings.

### *Extent to Which Appellant Was Informed that She was Free to Refrain from Answering Questions or to End the Interview*

The trial court credited Detective Harris's testimony at the hearing on the motion to suppress and found that appellant was advised that she was free to leave, that she could stop talking, and that if she wanted to consult with an attorney, then questioning would cease. It further credited Detective Harris's testimony that she advised appellant that "no matter what happens here today, you're going home . . . ." Accordingly, the trial court found that the ninth *Anderson* factor had been met, and we conclude that the evidence does not preponderate against this finding. This factor weighs in favor of the State.

Based on our consideration of all of the above factors, we conclude that *Miranda* warnings were not required because appellant was neither in custody nor would a reasonable person in her position have considered herself deprived of freedom of movement to a degree associated with a formal arrest. Appellant is not entitled to relief under this theory.

### B. Voluntariness of Statement

However, our inquiry does not end there. Appellant also contends that her will was overborne by Detective Harbaugh's questioning of her, rendering her statement involuntary. We note that while *Miranda* questions whether an in-custody suspect received the requisite warnings and knowingly and voluntarily waived certain constitutional rights, the voluntariness test remains distinct from *Miranda*. *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000); *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978)).

The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *Self v. State*, 65 Tenn. (6 Baxt.) 244, 253 (1873)). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* (citing *State v. Stamper*, 863 S.W.2d 404, 405 (Tenn. 1993)). The party who prevails at the suppression hearing is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Bishop*, 431 S.W.3d 22, 35 (Tenn. 2014).

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of

coercion." *Climer*, 400 S.W.3d at 568 (citing *Dickerson*, 530 U.S. 428 at 433-35; *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). The test for voluntariness of a statement is grounded in both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment and recognizes that coerced confessions are "inherently unreliable." *Id.* at 567-68 (citations omitted). Prior to *Miranda*, courts relied solely upon the voluntariness test to determine the admissibility of statements. *Id.* at 567 (citations omitted).

A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "Rather, 'coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . .'" *Id.* (quoting *Brimmer*, *id.*); *State v. Branam*, 855 S.W.2d 563, 568 (Tenn. 1993).

In determining the voluntariness of a statement, courts must examine the totality of the circumstances surrounding the confession, including "'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). Relevant circumstances include:

- [T]he age of the accused;
- his lack of education or his intelligence level;
- the extent of his previous experience with the police;
- the repeated and prolonged nature of the questioning;
- the length of the detention of the accused before he gave the statement in question;
- the lack of any advice to the accused of his constitutional rights;
- whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession;
- whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement;
- whether the accused was deprived of food, sleep[,] or medical attention;
- whether the accused was physically abused;
- and whether the suspect was threatened with abuse.

*Id.* (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (alteration in original) (emphasis omitted).

Appellant contends that her will was overborne because: (1) she had been questioned for four hours before Detective Harbaugh began the recorded segment of the interview; (2) Detective Stolinksy took her to see the victim and spoke to her about the "injustice" of the injuries immediately before Detective Harbaugh's interview; (3)

appellant had already made admissions to Detective Harris; (4) she inferred that she was no longer free to leave; (5) officers did the majority of the talking; and (6) her personal characteristics rendered her vulnerable to police questioning. We will apply each of appellant's contentions in the context of the relevant circumstances set forth in *Dickerson*.

## *Repeated and Prolonged Nature of Questioning*

We refer to the timeline established *supra* in the context of the *Miranda* issue. Again, we note that using the longest possible estimates, the entirety of appellant's involvement with law enforcement officials was four hours and fifty-six minutes. Officers did not question her for four hours *prior to* Detective Harbaugh's interview with her. Eliminating the one-hour period during which Detective Harris was obtaining background information and another approximate hour that accounted for breaks, the actual "interrogation" of appellant lasted around three hours. By appellant's own concession, set forth fully above, an interview of three to four hours is not, by its very nature, coercive.

We ascertain that appellant's contention that officers did most of the talking is another implication of the repeated and prolonged nature of questioning. We have listened to the recording in question and do not conclude the conversation to be onerous or one-sided. Rather, as the trial court found, we note that appellant often provided more information than called for by the question, she posited questions of her own, and she engaged in a conversation with officers. The evidence does not preponderate against the trial court's findings in this regard.

## *Detective Stolinsky's Taking Appellant to See the Victim*

Detective Stolinsky testified that during the first break, he asked appellant if she wanted to see the victim, and he accompanied her to the victim's room. Prior to this, appellant had not expressed a desire to see the victim. They stood on opposite sides of the bed, and medical personnel "were in and out constantly." He advised her that the detectives were "just trying to find out what happened" to the victim. Appellant did not make any statements during the approximately fifteen-minute-long stay in the victim's room. Detective Stolinsky never touched appellant or made any threats toward her.

At the hearing on the motion to suppress, both the State and trial counsel questioned Detective Stolinsky with regard to his actions in escorting appellant to the victim's room. Appellant had been in the interview room for over an hour without seeing the victim. Appellant infers nefarious intent on the detective's behalf, implying that he was utilizing a coercive tactic in taking her to see the victim in her ICU room. However,

no such testimony was elicited, and we will not make such a determination.  This factor does not work against the State.

*Appellant's Previous Admissions to Detective Harris*

Appellant cites *State v. Miller* for the proposition that "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed.  He can never get the cat back in the bag.  The secret is out for good."  674 S.W.2d 279, 289 (Tenn. 1984) (Fones, J., dissenting).  First, this factor does not fall within the list of circumstances to be considered under a *Dickerson* voluntariness analysis.  Second, the *Miller* case deals with admissibility of subsequent confessions to law enforcement officers following a confession that has been held inadmissible.  This factor does not buttress appellant's position.

*Inference that Appellant Was No Longer Free to Leave*

Appellant again seeks to rely upon the negative implication that if Detective Harris twice informed appellant that she was free to leave and free to cease answering questions but that Detective Harbaugh did not give such admonitions, then the natural and probable conclusion was that she was no longer free to leave.  We again decline to adopt this position for the reasons stated herein, *supra.*

*Appellant's Personal Characteristics*

Finally, appellant argues that her personal characteristics rendered her vulnerable to police questioning.  She argues that her intelligence actually worked to her disadvantage because it made the situation even more alien to her.

The trial court concluded, based on appellant's testimony at the hearing on the motion to suppress and the recorded statement, that appellant was a willing participant and that there was no indication of involuntariness.  In doing so, the trial court made findings with regard to the credibility of the witnesses, weighing the evidence, and resolving conflicts in the evidence, which we will not second-guess.  *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012).  However, we are mindful that when reviewing a trial court's ruling on a motion to suppress, we are to consider the entire record, including the evidence adduced at trial.  *Sanders*, 452 S.W.3d at 306.

Dr. Walker testified at trial that appellant was Asian-American and that an important part of that culture was respect for elders and respect for those in positions of authority.  However, he admitted that he was unaware of the adoption paperwork appellant and Mr. Mark had completed wherein they wrote that although they were

Chinese, they did not have a "strong grasp" with the Chinese culture. He acknowledged that appellant had portrayed to him that she, in fact, had a strong tie with the Chinese culture. Dr. Walker agreed that it was a fair assessment that appellant "thinks ahead" when answering questions.

Dr. Walker's assessment was that appellant was nonconfrontational, avoided conflicts, and felt she had lower self-esteem than others. He opined that those characteristics would make a person more likely to admit doing something they had not done. Dr. Walker administered an EQI to obtain appellant's emotional rather than intelligence quotient. The results indicated that appellant had low self-esteem, did not hold herself in high regard, and felt as though she was never able to achieve as her family expected. He said that appellant is empathetic, sympathetic, compassionate, deferential, and unlikely to assert herself. He described that she had a great deal of social responsibility, was a rule-follower, and was not a good problem solver. He said, "She's a very suggestible person. She's very compliant."

Even so, on cross-examination, when the State asked Dr. Walker whether he had an opinion about whether appellant's statement to the police was true, he acknowledged that it was "very possible " that she was telling the truth in her statement.

We conclude that appellant's statement was freely and voluntarily given and was not the product of coercive action. Appellant is not entitled to relief.

## C. Videotape of the Victim

Appellant argues that the trial court erred by admitting a videotape of the victim that was prepared by the adoption agency. As grounds, appellant states that the video was irrelevant and prejudicial. The State maintains that it was relevant to rebut an issue interjected by the defense. We agree with the State.

The determination of whether evidence is relevant and admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception is that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Unfair prejudice"

is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Tenn. R. Evid. 403, Adv. Comm. Note).

The video in question was prepared by the adoption agency and was introduced through Ms. Banks, the representative from Bethany Christian Services. She testified that the video was not produced in a situation where the victim was prompted and presented in the best possible light; rather, it was produced to show the most accurate representation of the child to prospective adoptive parents. She said that no one wanted the family to return home from China and be disappointed because they had been misled.

As to the relevance, appellant began weaving her theory of the case during opening statements when counsel assured the jury that they would show that the victim was underweight, suffered from severe malnutrition, had brittle bones, bruised easily, and likely suffered from cerebral palsy. In fact, counsel continued with that theory throughout his questioning of the witnesses. He elicited from Dr. Lien that malnutrition could have contributed to the victim's anemic condition. Counsel attempted, albeit unsuccessfully, to interject malnutrition into Dr. Hain's testimony, but Dr. Hain clarified that even if the victim were malnourished, the bones and brain would be the last systems to be affected, so "definitively," malnutrition did not contribute to her skeletal or brain injuries.

In light of appellant's continued attempts to mitigate her actions *vis-à-vis* the severity of the victim's injuries, the video depicting the victim in life, showing that she did not suffer from the maladies claimed by appellant, was relevant to rebut appellant's theory of the case. Moreover, the relevance of the video was not substantially outweighed by its prejudicial effect. The trial court did not abuse its discretion in admitting the video. Appellant is not entitled to relief.

### D. Sufficiency of the Evidence Underlying Count III of the Indictment

Appellant contends that the evidence is insufficient to sustain the conviction for aggravated child abuse in Count III of the indictment based upon the loss of four of the victim's primary teeth. The State answers that because the statute regarding serious bodily injury in child abuse cases is not limited to those injuries specifically enumerated, loss of primary teeth qualifies as a serious bodily injury.

As applicable to this count of the indictment, "'[s]erious bodily injury to the child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement . . . ." Tenn. Code Ann. § 39-15-402(d). Although the loss of

primary teeth is not specifically listed in the statute, we begin with "'the *ejusdem generis* canon of statutory construction, stating that 'the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries.'" *State v. Farmer*, 380 S.W.3d 96, 101 (Tenn. 2012) (quoting *State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995)).

The applicable definition in this case, "serious bodily injury to the child," is different from the statutory definition of "serious bodily injury" in the criminal code. Tenn. Code Ann. §§ 39-11-106(34), 39-15-402(d). "[S]erious bodily injury" includes bodily injury that involves: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty . . . ." Tenn. Code Ann. § 39-11-106(34). This definition is exhaustive; there is no provision for consideration of injuries that are not specifically enumerated. In contrast, the statute defining "serious bodily injury to the child," Tennessee Code Annotated section 39-15-402(d), is not exhaustive. The list of injuries includes, "*but is not limited to*," the named injuries. *Id.* (emphasis added). The general definition of serious bodily injury has been construed by our supreme court in *Farmer* using the *ejusdem generis* canon of statutory construction to conclude that a "clean" gunshot wound that was treated within an hour and that required only pain relievers as treatment did not meet the statutory definition of serious bodily injury. *Farmer*, 380 S.W.3d at 101. Likewise, the *Sims* court concluded that the pain commonly associated with a broken nose was not extreme enough to be included among the injuries that constituted serious bodily injury. *Sims*, 909 S.W.2d at 49. In contrast, prior to the 2009 amendment to the serious bodily injury to a child statute that provided a definition for serious bodily injury, this court held that a cigarette burn on a child's palm was sufficient to meet the threshold of serious bodily injury. *See State v. Wanda Elaine Brock*, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *7 (Tenn. Crim. App. Mar. 16, 2011) (finding serious bodily injury although burns such as the one inflicted upon the victim were generally treated with antibiotic ointment).

When a statute is ambiguous or does not address a precise issue, courts may reference the broader statutory scheme, the history of the legislation, the "objective and spirit behind the legislation," or other sources in ascertaining its intent. *Wlodarz v. State*, 361 S.W.3d 490, 496 (Tenn. 2012) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998); *Lipscomb v. Doe*, 32 S.W.3d 840, 845 (Tenn. 2000)). Because the statute at issue is non-exhaustive and is, thus, arguably ambiguous, a review of the pre-2009 amended statute is helpful. Effective July 1, 2005, Tennessee Code Annotated section 39-15-402(a) read:

> A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment who commits the offense of child

abuse . . . or who commits the offense of child neglect or endangerment . . .
and:

>      (1)      The act of abuse or neglect results in serious bodily injury to
>               the child; or
>
>      (2)      The act of neglect or endangerment results in serious bodily
>               injury to the child; or
>
>      (3)      A deadly weapon, dangerous instrumentality or controlled
>               substance is used to accomplish the act of abuse, neglect or
>               endangerment; or
>
>      (4)      The act of abuse, neglect or endangerment was especially
>               heinous, atrocious or cruel, or involved the infliction of
>               torture to the victim.

Reviewing the history of this statute, it is clear that the legislature intended to punish acts that could be considered "torturous" to the victim, precipitating a non-exhaustive list of qualifying injuries in the 2009 amendment. Examining the list of injuries enumerated by each statute, the legislature intended the threshold of injury necessary to establish "serious bodily injury to the child" would be less than that required to establish "serious bodily injury" under the general definition of the criminal code.

In this case, based on the medical testimony, the evidence is uncontroverted that the victim was systematically tortured over time. Having four primary teeth forcibly knocked out is just one of the means by which appellant accomplished her torturous treatment of the victim. We conclude that the pain associated with the forcible loss of primary teeth is commensurate with the class of injuries encompassed by the statute. Appellant is not entitled to relief.

### E. Partial Consecutive Sentencing

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed

should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Prior to 2013, on appellate review of sentence alignment issues, courts employed the abuse of discretion standard of review. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review enunciated in *Bise* to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *Bise*, 380 S.W.3d at 707; *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying abuse of discretion with a presumption of

reasonableness to review of alternative sentencing determinations by the trial court). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b) . . . ." *Pollard*, 432 S.W.3d at 861.

The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the following seven statutory criteria exists:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

*Id.* § 40-35-115(b).


The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*

Of the seven statutory factors, the trial court in this case found the following to apply:  the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.  Tenn. Code Ann. § 40-35-115(b)(4).  The trial court stated:

> Using that application that consecutive sentencing would be proper, of course, that statute specifically says, the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk to human life is high.
>
> . . . .
>
> A parent who would kill their child is the poster child for a dangerous offender. Their picture should be in Webster's Dictionary beside the words, dangerous offender. So there's no question in this Court's mind that Mrs. Mark does meet the definition of a dangerous offender.
>
> The second part of that test though is, is even though she's found to be a dangerous offender, does consecutive sentencing serve any valid state purpose, particularly in this particular case for which she's serving a life sentence.  I think certainly it does because, you see, children are part of the state and children need to know, as well as their parents and everyone else, that they will be protected, and that crimes against our children are the most serious of all crimes.
>
> In fact, there's a statute we have on aggravated child sexual abuse which specifically calls for consecutive sentencing in those appropriate situations. Our legislature in making a notation that this is a one hundred percent offender has made a determination that this is one of the most

serious, if not the most serious, of all offenses. The legislature has decided that.

So I think that consecutive sentencing in this particular instance does serve a valid state purpose and does meet the requirements of the statute.

When a trial court relies upon the "dangerous offender" factor in imposing consecutive sentences, it must make certain factual findings pursuant to *State v. Wilkerson,* 905 S.W.2d 933 (Tenn. 1995). Under *Wilkerson*, before imposing consecutive sentences based upon the defendant's status as a dangerous offender, the trial court "must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). The *Pollard* court declined to eliminate this requirement in applying the abuse of discretion with a presumption of reasonableness standard of review to consecutive sentencing. *Id.*

Although the trial court stated that appellant is a dangerous offender, it did not make requisite *Wilkerson* findings. However, the *Pollard* court offered guidance for how to address a situation wherein the trial court applied factor (4) without making the *Wilkerson* findings. Our supreme court stated:

Where, as here, the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. Faced with this situation, the appellate court has two options: (1) conduct a *de novo* review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences. *See Bise*, 380 S.W.3d at 705 & n.41.

*Id.* at 863-64. Based on the record before us, we are satisfied that the proof at trial established that the aggregate sentence is "reasonably related to the severity of the offenses." *Pollard*, 432 S.W.3d at 863 (citation omitted). In sum, the medical testimony revealed that prior to receiving the fatal blow, the victim had healing rib fractures that were inflicted between one and six weeks prior to her death and an ulnar fracture that was inflicted six to eight weeks prior to her death. She had also endured having her teeth knocked out, having fingers broken, having her nipples pinched to the point of scarring, and having some sort of injury, possibly a burn, inflicted to the back of one of her thighs that resulted in scarring. Dr. Hain opined that the victim had been "tortured" and then killed.

We also conclude that the aggregate sentence is "necessary in order to protect the public from further criminal acts." *Id.* (citation omitted). Considering the callous disregard with which appellant treated the victim, it is unconscionable that she should ever be in the presence of another child, and her remaining daughter and others should be protected from further criminal acts by this appellant.

Finally, we agree with the State that as a physician, appellant was in a position to know that her actions and behavior constituted a high risk to human life. Nonetheless, appellant treated the victim in a manner that displayed little or no regard for human life for an extended period until the abuse ended in the victim's death. Appellant is not entitled to relief on this claim.

## F. Clerical Errors in Judgment Forms

Several errors exist in the judgment forms that require correction on remand. The parties agreed that appellant should be sentenced as a Range I, standard offender, but many of the judgment forms do not reflect this classification. Although the trial court marked "100% Violent," it is nonetheless necessary to select an offender status on the judgment form. In addition, the judgment form for Count IX indicates that it is to be served consecutively to Counts I through IV. This is in direct contravention of the trial court's intent as reflected in the transcript of the sentencing hearing. The trial court, at the sentencing, aligned each of appellant's twenty-year sentences consecutively to each other (Counts II, III, IV, and V) and consecutively to her life sentence (Count I). It aligned her three-year sentences (Counts VI, VII, VIII, and IX) concurrently with each other and concurrently with Count II but consecutively to Count I. The court stated, "It's my intention . . . that the total effective sentence will be life plus eighty years without parole." When there is a conflict between the transcript and the judgment form, the transcript controls. *See State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991). Accordingly, the judgment forms must be corrected as follows:

Counts I - IV: Corrected to reflect appellant is a Range I, standard offender

Count IX: Corrected to reflect appellant is a Range I, standard offender and to reflect that the sentence is to be aligned consecutively to Count I but concurrently with Counts II, VI, VII, and VIII.

## CONCLUSION

Based on our thorough review of the entire record, the briefs of the parties, the applicable legal authorities, and the arguments of counsel, we affirm appellant's

convictions and sentences. However, we remand for entry of corrected judgments consistent with this opinion.


_____

ROGER A. PAGE, JUDGE